# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KC **FILED**

JUL 2 3 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

THE CANCER FOUNDATION, INC.            )
2 Pomona East, Apt. 305                )
Baltimore, MD 21208                    )
                                   )
   -and-                 )
                                   )
ALLECO, INC.                           )
2077 Maidstone Farm Road               )
Annapolis, MD 21409                    )
                                   )
   -and-                 )
                                   )
CHARLES AMERA                          )     07CV4120
4902 Starker Ave                       )     JUDGE LEFKOW
Madison, WI                            )     MAGISTRATE JUDGE KEYS
                                   )
                                   )
   -and-                 )
                                   )
ANNE E. AMERA                          )
4902 Starker Ave                       )
Madison, WI                            )
                                   )
   -and-                 )
                                   )
SHARON BOEGER                          )
1990 Baintree Road                     )
Davis, IL 61019                        )
                                   )
   -and-                 )
                                   )
DORTHY BROOKS                          )
307 Newcomer Road                      )
North Henderson, IL 61466              )
                                   )
   -and-                 )
                                   )
SUE D. BURMESTER                       )
727 State Highway 72                   )
Kirkland, IL 60146                     )
                                   )
   -and-                 )
                                   )

LARRY FEINE                          )
241 South Street                     )
Dakota, IL 61018                     )
                                     )
        -and-                        )
                                     )
NANCY L. GRAHAM                      )
4008 28th Ave.                       )
Rock Island, IL 61201-5803           )
                                     )
        -and-                        )
                                     )
GILBERT GRAHAM                       )
4008 28th Ave.                       )
Rock Island, IL 61201-5803           )
                                     )
        -and-                        )
                                     )
JAMES E. HEITKAMP                    )
8000 Kieffer Drive                   )
East Dubuque, IL 61025               )
                                     )
        -and-                        )
                                     )
MICHAEL J. HEITKAMP                  )
14501 W. Creek Valley Rd.            )
East Dubuque, Il 61025               )
                                     )
        -and-                        )
                                     )
VIRGINIA HEITKAMP HOLLAND            )
8234 N. Watson Rd.                   )
Scalis Mount, IL 61075               )
                                     )
        -and-                        )
                                     )
EUGENE M. HITCHCOCK                  )
10752 Ridatt Road                    )
Pecatonica, IL 61063                 )
                                     )
        -and-                        )
                                     )
FLORENCE E. HITCHCOCK                )
10752 Ridatt Road                    )
Pecatonica, IL 61063                 )
                                     )
        -and-                        )
                                     )

2

ROBERT HUMMEL )
24 W. Highland #1 )
Villa Park, IL 60181 )
)
    -and- )
)
KENNETH KLUESNER )
323 3rd St )
Bloomington, WI 53804-0000 )
)
    -and- )
)
MORTON M. LAPIDES, SR. )
2077 Maidstone Farm Road )
Annapolis, MD 214019 )
)
    -and- )
)
VERNON LYONS )
15627 Erin Lane )
Orland Park, IL 60462 )
)
    -and- )
)
RUTH LYONS )
15627 Erin Lane )
Orland Park, IL 60462 )
)
    -and- )
)
CECIL E. METZ )
1032 Montclair Dr )
Racine, WI 53402-3438 )
)
    -and- )
)
MML, INC )
2077 Maidstone Farm Road )
Annapolis, MD 21409 )
)
    -and- )
)
MARILYN J. MUNZ )
5208 W. Parkview )
McHenry, IL 60050 )
)

3

-and- )
                                    )

ANTHONY SPINA )
1723 N. 76 Ave. )
Elmwood Park, IL 60707 )
  )
       -and- )
  )

ANITA SPINA )
1723 N. 76 Ave. )
Elmwood Park, IL 60707 )
  )
       -and- )
  )

TRANSCOLOR CORP. )
2077 Maidstone Farm Road )
Annapolis, MD 21409 )
  )
    -and- )
  )

VALLEY RIVET COMPANY, INC. )
2077 Maidstone Farm Road )
Annapolis, MD 214019 )
  )
-and- )
  )

VR HOLDINGS, INC. )
2077 Maidstone Farm Road )
Annapolis, MD 21409 )
  )
  )

                 Plaintiffs, )
  )

       v. )
  )

CERBERUS CAPITAL )
 MANAGEMENT, LP )
450 Park Avenue, 28th Floor )
New York, NY 10022 )
  )
    -and- )
  )

MADELEINE, LLC )
450 Park Avenue, 28th Floor )
New York, NY 10022 )
  )
    -and- )
  )

GORDON BROTHERS GROUP )
260 Franklin St Ste 800 )
Boston, MA 02199 )
)
  -and- )
)
THIRD AVENUE VALUE FUND )
622 Third Avenue )
32nd Floor )
New York, NY 10017 )
)
  -and- )
)
CARL MARKS, INC. )
900 Third Ave )
New York, NY10022 )
)
  -and- )
)
WARREN FEDER )
450 Park Avenue, 28th Floor )
New York, NY 10022 )
)
  -and- )
)
STEPHEN A. FEINBERG )
450 Park Avenue, 28th Floor )
New York, NY 10022 )
)
  -and- )
)
MARTIN J. WHITMAN )
622 Third Avenue, 32nd Floor )
New York, NY 10022 )
)
                 Defendants. )
)

## COMPLAINT

COME NOW, twenty-eight Plaintiffs, being part of 2,500 claimants, and in support their

claims in this matter, allege as follows:

1.       This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §

1331 because the RICO claims alleged in Counts III and IV are based on a federal statute. This

5

Court has pendant jurisdiction over the claims asserted in Counts I, II and V under 28 U.S.C. § 1367.

     2.     Venue is proper in this District pursuant to 28 U.S.C. 1391(a)(3) because at least one of the Defendants is subject to the personal jurisdiction of the State of Illinois

     3.     Plaintiffs Charles Amera, Anne Amera, Sharon Boerger, Dorothy Brooks, Ms. Sue Burmester, Larry Feine, Gilbert Graham, Nancy L. Graham, James E. Heitkamp, Michael J. Heitkamp, Virginia Heitkamp Holland, Eugene M. Hitchcock, Florence E. Hitchcock, Robert Hummel, Kenneth L. Kluesner, Vernon Lyons, Ruth Lyons, Cecil E. Metz, Marilyn J. Munz, Anthony Spina, Anita Spina, are holders of Senior Secured Notes that were originally issued by Plaintiff Alleco, Inc. (the "Senior Notes"), but upon which Plaintiff Transcolor Corp. ("Transcolor") eventually became jointly and severally liable (the "Senior Note Holder Plaintiffs").

     4.     Plaintiff The Cancer Foundation, Inc. is a 501(c)(3) organization that is involved in the development of cancer treatments.

     5.     Plaintiff MML, Inc. ("MML") is a corporate entity operating in the State of Maryland. At all times relevant to this Complaint, MML was the parent of Transcolor Corp.

     6.     Plaintiff Valley Rivet is a corporate entity that at all times relevant to this Complaint, operated in the State of Illinois, and during certain times relevant to this Complaint, was a subsidiary of Transcolor.

     7.     Plaintiff VR Holdings is a corporate entity that during the course of events described hereafter in the Complaint, became the parent of MML and Valley Rivet.

     8.     Plaintiff Morton M. Lapides, Sr. ("Lapides") is an individual residing in the State of Maryland. During all times relevant to this Complaint, Mr. Lapides held an ownership interest in VR Holdings, Valley Rivet, MML, and Transcolor.

6

9.      Defendant Gordon Brothers Group is a company that operates in, among other states, Illinois. Gordon Brothers' main offices are located in Boston, MA. On information and belief, Gordon Brothers Group succeeded to the interests and liabilities of an entity known as Gordon Brothers Capital Corp.. As the successor to Gordon Brothers Capital, Gordon Brothers is liable for the damages alleged herein caused by Gordon Brothers Capital.

10.     Defendant Cerberus Capital Management, LP ("Cerberus") is a company that operates and has offices in, among other states, Illinois. Cerberus Partners' main offices are located in New York, New York.

11.     Defendant Madeleine, LLC is an entity that was created by Defendant Cerberus to achieve one of the transactions underlying this suit.

12.     Warren Feder is an individual who, at all times material to the allegations in this Complaint, was the President of Gordon Brothers Capital. Upon information and belief, Mr. Feder is a resident of State of New York.

13.     Stephen A. Feinberg is an individual who, at all times material to the allegations in this Complaint, was the President of Cerberus. Upon information and belief, Mr. Feinberg is a resident of the State of New York.

14.     Third Avenue Value Fund is a company that operates in, among other states, Illinois. Third Avenue Value Fund's main offices are located in New York, NY.

15.     Carl Marks, Inc. is a company that operates in, among other states, Illinois. Carl Marks' main offices are located in New York, NY.

16.     Martin J. Whitman is an individual who, at all times material to the allegations in this Complaint, was the President of Third Avenue Value Fund. Upon information and belief, Mr. Whitman is a resident of the State of New York.

7

## FACTUAL ALLEGATIONS

17.     Plaintiff Transcolor is a company that, at one time, printed and sold screen printed shirts. Its shirts were produced at two plants, one located in Commerce City, CA, and a second in Albany, GA. At all times material to this Complaint, Transcolor was a subsidiary of MML

18.     In 1995, Transcolor agreed to be jointly and severally liable on the Senior Notes, which were issued by Alleco and which were valued at $6.7 million. Alleco was a separate subsidiary of MML.

19.     From 1994 through 1996, Transcolor began to lose significant business because many of its customers were installing their own printing presses. As a result, its two plants were operating at approximately 20% of their capacity.

### The Purchase Of Winterland Concessions

20.     Winterland Concessions Company was an entity that, at one time, held approximately 300 licenses that allowed it to print images on tee shirts authorized by numerous significant entertainers and to sell the resulting tee shirts at concerts and other locations, as well as the owner of various "Rock" memorabilia valued at approximately $100 million.

21.     Winterland's primary plant was located in San Francisco, CA. However, by 1996, this plant had recently displayed the presence of significant asbestos. Rather than relocate and/or construct a new plant, Winterland's parent, Music Corporation of America ("MCA"), and MCA's parent Seagrams, determined to sell Winterland's business.

22.     As a result, in or about March 1996, MML, the parent of Transcolor, began negotiations with MCA to purchase Winterland. The purchase of Winterland would be extremely lucrative for Transcolor because while its business was declining for the above described reasons, its two plants were capable of printing at very high volumes. In addition, its Albany, GA plant would allow the company to realize significant savings when selling shirts on the East Coast.

8

23.     MML intended to purchase Winterland through a so-called bridge loan with a six-month term and consolidate it with Transcolor. The purchase of Winterland was completed in August 1996.

24.     On August 14, 1996, Gordon Brothers Capital and Cerberus (through its affiliate, Madeleine L.L.C.) agreed to extend to Winterland a line of credit of up to $23,000,000, due January 1997, with additional exit fees to be paid in the amount of $4.5 million. The loan was secured by Winterland's receivables, inventory, fixed assets, artist licenses, 100% of Winterland's stock (which before reserves and forgiven notes, had a value of $69 million), and guarantees from Lapides and MML.

25.     At the time of this transaction, a company by the name of Valley Rivet was a subsidiary of Transcolor. In 1995, Valley Rivet loaned Transcolor approximately $3 million. Transcolor has been unable to repay the entirety of the loan as a proximate result of Defendants' actions.

26.     As part of MML's purchase of Winterland, Transcolor sold its inventory and leased its buildings and machinery to Winterland. As a result of this transaction, Transcolor's only assets were Valley Rivet and its leases with Winterland. However, it was expected that per the agreement, these leases would generate approximately $1.4 million annually over a ten year period for Transcolor. As a result, Transcolor was converted from an entity that was losing approximately $3 million per year, excluding Valley Rivet's earnings, to a highly profitable enterprise.

27.     Prior to the closing of the Winterland acquisition on August 14, 1996, MML and an individual by the name of Carl Kampel ("Kampel") agreed to have Kampel join Winterland as its Chief Financial Officer and a member of its Board of Directors.

28.     Kampel began his employment with Winterland on August 26, 1996.

<u>Gordon Brothers Capital And Cerberus Conspire With Kampel</u>

29.     Beginning in the Fall of 1996, Kampel made several trips between Winterland's

9

Linthicum, Maryland offices, where Kampel was based, and Winterland's headquarters in San Francisco, California.

30.     On at least two of these occasions, Kampel met with the President of Gordon Brothers, Warren Feder, who was evaluating Winterland on behalf of the lenders.

31.     As a result of his dealings with the President of Gordon Brothers, Kampel, who by late Fall of 1996 had become hostile to Lapides and other members of Winterland's management, became aware of Mr. Feder's interest in taking over the ownership of Winterland.

32.     In late November or early December 1996, with the unpaid portions of the loans extended by Gordon Brothers Capital and Cerberus coming due in January 1997, Winterland's financial situation was becoming increasingly precarious, in spite of having repaid $10 million of the loan from continuing operations.

33.     Sometime between November 1996 and January 1997, Kampel, in violation of his contractual and fiduciary duties as an officer and director of Winterland, determined that he would secretly assist Cerberus and Gordon Brothers Capital and others in wresting control and ownership of Winterland away from MML, and attempt to gain an equity position in the company for himself.  On information and belief, two other companies, Third Avenue Value Fund and Carl Marks, Inc., were participants in this conspiracy, as well as Feinberg and Whitman.

34.     In furtherance of this goal, Kampel engaged in a series of overt acts of omission or commission against Winterland's financial interests with the purpose of preventing Winterland from obtaining refinancing of the Gordon Brothers/Cerberus loans due, so that the mounting financial pressure would eventually force Winterland to sell to new owners.  These new owners would then convey personal benefits to Kampel.  These acts were done at the direction or with the approval of Gordon Brothers Capital, Cerberus, Feinberg, and Feder as part of the plan to obtain Winterland.

10

35.    For example, beginning in December 1996, Winterland's relationship with some of its suppliers deteriorated, and in order to keep its business operating, Winterland needed to arrange for a replacement line of credit. In addition, Winterland was aggressively seeking and identifying sources of long-term financing to replace the short-term loan made by Gordon Brothers and Cerberus' affiliate, Madeleine, LLC. Each time Kampel was presented with a potential source of capital, Kampel would either refuse to pursue the option, or evaluate it in such bad faith that the option would not be pursued. Indeed, beginning in November, 1996 and continuing through March, 1997, Kampel frequently disobeyed direct orders from Lapides and other Winterland management to pursue and follow up with certain financing opportunities that would otherwise have provided Winterland with necessary working capital. Kampel improperly engaged in the foregoing conduct to promote his personal interests and those of Cerberus and Gordon Brothers.

36.    On or about January 3, 1997, Feder approached Winterland on behalf of Gordon Brothers and Madeleine, and said that Gordon Brothers Capital and Madeleine would extend the due date on the bridge loans and continue to finance Winterland through March 1997, but only if Gordon Brothers Capital and Cerberus assumed a greater equity interest in Winterland, obtained majority control, and relegated MML to a non-controlling minority status.

37.    Sometime in late December 1996 or early January 1997, Kampel secretly decided to take steps to prevent MML, on behalf of Winterland, from being able to obtain alternative financing so as to improperly place financial pressure on MML to force it to accept Gordon Brothers' and Cerberus' terms.

38.    More specifically, Kampel entered into an agreement with Warren Feder (which was known to and authorized by Feinberg) that if Gordon Brothers Capital and Madeleine took over Winterland, Kampel would continue as CFO for the new ownership, and that Kampel would receive, for his personal benefit, stock in Winterland for an investment of $50,000. This would give Kampel

11

an equity stake in Winterland that was not available to him from the current ownership. Neither MML, nor anyone who was an owner or agent of Winterland, was aware of this agreement.

39.     At the same time Kampel entered into his agreement with Warren Feder, Lapides and Gordon Brothers Capital continued to conduct negotiations about Gordon Brothers Capital and other associated entities providing a replacement line of credit, not a sale, for Winterland and converting the existing short term-loan into a long-term loan.

40.     In December 1996, Winterland entered into an agreement with Capital Factors, Inc., a company with whom Winterland had a prior relationship, that Capital Factors would provide a $1 million factor guaranty and/or letter of credit that would allow Winterland to continue to purchase from suppliers. In addition, Capital Factors issued a letter of intent proposing to provide Winterland with receivable-based financing for the purpose of replacing Winterland's existing bridge loans with long-term financing.

41.     In late February 1997, Warren Feder went to Capital Factors' offices to discuss the plan to take over control of Winterland, and told Jim Morrison and Rob Garfolo of Capital Factors that "Carl Kampel is already on my team," or words to that effect, referring to the agreement between him and Kampel.

42.     As a result of the meeting with Warren Feder, when Kampel called Jim Morrison and Rob Garfolo to discuss the prospective financing, they refused to deal further with Kampel on the grounds that Capital Factors was no longer sure whether Kampel was representing Winterland's interests as opposed to the interests of Gordon Brothers.

43.     As a result of Kampel's unlawful action, Capital Factors concluded that there was a battle for control of Winterland, and that Kampel was covertly cooperating with Gordon Brothers and Cerberus. Capital Factors demanded waivers in order to insulate itself from liability arising from the conflict and ultimately refused to provide financing.

44.     In early February 1997, Kampel had also been entrusted to negotiate potential financing from

12

Gordon Brothers Capital and Third Avenue Value Fund, which had been introduced to Winterland by Gordon Brothers Capital as a potential replacement for Cerberus. Lapides had instructed Kampel that before he agreed to accept any financing from Gordon Brothers Capital and Cerberus, which would result in MML losing control of Winterland, Winterland had to be given 30 days to find financing from another source. Kampel ignored this order, and attempted to enter into an agreement calling for a March 15, 1997, closing date with Gordon Brothers Capital and Third Avenue, thereby foreclosing the possibility of obtaining alternate financing because there would be insufficient time for other lenders to conduct their due diligence review. This action was again in furtherance of Kampel's plan to prevent Winterland from obtaining financing independent of Gordon Brothers Capital and to force a takeover that would benefit Kampel personally.

45.     Winterland's inability to obtain long-term financing from Capital Factors, or from any other source, resulted from Kampel's actions as part of his plan to strangle Winterland financially so that Kampel could personally benefit according to his agreement with Gordon Brothers' President, representing both lenders. Kampel continued to refuse direct orders from Lapides to attempt to obtain financing from other sources. The failure to obtain financing as a result of Kampel's acts further increased the financial pressure on Winterland, because it left Winterland with no access to working capital, and its loans either in default or about to come due in March, 1997, the extension date granted by the lenders in January 1997.

46.     After learning from Capital Factors that Kampel and Feder, representing the lenders, had arrived at some sort of agreement, on March 4, 1997, Lapides and John Woods, in-house counsel for Winterland and Transcolor, confronted Kampel and asked him if he was cooperating with Gordon Brothers Capital and Cerberus to accomplish the takeover of Winterland. Kampel confessed to Lapides and Woods that he and Warren Feder had agreed that if Winterland was taken over by Gordon Brothers, Kampel would receive a significant amount of stock in the company on favorable terms not generally available to others.

47.     As a result of the March 4th meeting and his confession to acts of disloyalty and self-dealing, on or about March 5, 1997, Kampel was removed from Winterland's Board of Directors and put on leave. As a result of Kampel's confession at the March 4th meeting, and his continued actions in sabotaging Winterland's supplier and potential lender relationships, Kampel was placed on administrative leave, effective March 6, 1997. By letter dated March 6, 1997, Kampel was barred from entering Winterland's premises or contacting any of its employees, although he was informed that he would continue to receive his full salary and benefits pending further review. This leave with pay was subsequently extended such that Kampel has never actively resumed his duties as CFO.

The "Domino Effect" Of The Conspiracy To Take Over Winterland

48.     Winterland's difficulties with its suppliers continued. One such supplier of blank tee shirts for Winterland's Tommy Hilfiger contract, Springford Mills, contacted Kampel on March 5, 1997, to inquire about Winterland's financial status. Kampel responded that he was not at liberty to discuss such matters, and told Springford Mills representative Mark Smith that all such questions should be referred to Winterland's General Counsel, John Woods. This response, which Kampel repeated to other suppliers making similar inquiries about Winterland's financial health, was contrary to Kampel's prior practices of dealing with such questions, and was undertaken without consulting John Woods. Kampel's responses to suppliers were made for the unlawful purpose of further weakening Winterland's precarious financial position, and thereby affect a takeover from which Kampel would personally benefit.

49.     As a result of Kampel's unlawful conduct, Mr. Woods was "blind-sided" by a telephone call from an executive of Sun Trust Bank, a factor of another of Winterland's suppliers. The unexplained and extraordinary referral to Winterland's General Counsel caused the suppliers, including Springford Mills, to conclude that Winterland was on the verge of filing for

bankruptcy, making them even more reluctant to supply any further tee shirts on credit, as
they had in the past

50.     Shortly after Kampel was placed on administrative leave, Winterland was
informed by Gordon Brothers Capital and Cerberus that they considered Winterland to be in default on
its loan, based on Winterland's failure to provide monthly and year-to-date financial statements
certified by the CFO.

51.     Under the loan agreement with Gordon Brothers Capital and Cerberus, Winterland was
required to provide such CFO certified financials within 30 days of the end of each month,
covering the prior month and the year to date. Upon receiving notice from the lenders that
these financials had not been provided, Winterland General Counsel John Woods questioned
Kampel as to whether the allegation was true, and Kampel responded that it was and that he
had never provided the lenders with any financials after November 1996.

52.     In 1997, MML filed suit against Kampel for, among other things, breach of fiduciary
duty to recover for the damage he had caused to Winterland.

53.     Winterland continued to experience significant financial difficulties because of,
among other things, its inability to obtain alternate financing in order to satisfy its remaining debt to
Gordon Brothers Capital and Cerberus.

54.     As a result, on April 11, 1997, Gordon Brothers Capital and Cerberus entered into a
Shareholder and Settlement Agreement (the "Shareholder Agreement") whereby (1) Cerberus and
Gordon Brothers Capital became the 80% owners of Winterland; (2) MML was relegated to a 20%
owner of Winterland; (3) MML agreed to dismiss its lawsuit against Kampel; (4) Cerberus and
Gordon Brothers Capital agreed to not re-hire Kampel; (5) Cerberus and Gordon Bothers agreed to
provide an additional year of financing to Winterland; and (6) MML had the right for one year to
repurchase the stock if it paid the balance of the loan made by Cerberus and Gordon Brothers.

15

55. As a result of this agreement, Gordon Brothers Capital and Cerberus caused Transcolor's leases with Winterland to be extended for another year, as well as the employment contracts of Mr. Lapides and his Assistant.

56. A material implied covenant of the Shareholder Agreement was that Cerberus and Gordon Brothers Capital would not interfere with Winterland's operations for one year.

57. In breach of this implied term, on August 8, 1997, Gordon Brothers Capital and Cerberus placed Winterland in bankruptcy.

58. Because Winterland was now in bankruptcy, it was no longer required to make the payments required under its leases with Transcolor, causing Transcolor to lose $14 million in annual lease payments. Since these lease payments were Transcolor's only sources of revenue, Transcolor could no longer continue to operate.

59. When Winterland was discharged from bankruptcy on or about July 5, 2000, these leases were formally terminated.

60. In 1998, as a result of Transcolor's loss of the income from the Winterland leases, National City Bank ("NCB"), the Indenture Trustee of the 1993 Trust Indenture for the Senior Secured Notes, petitioned to place Transcolor in bankruptcy. With Transcolor in bankruptcy, the approximately $7 million dollars in Senior Notes for which Transcolor was jointly and severally responsible with Alleco were now in default.

61. Also, in 1998, VR Holdings agreed to donate $80 million to the Cancer Foundation, Inc. to support the development of alternative medical regimens used concurrently with conventional therapies to study and cure cancer.

62. On August 13, 1999, NCB filed suit in the United States District Court for the District of Maryland against Mr. Lapides, Transcolor, and Alleco, alleging malfeasance that harmed the Senior Note Holders (the "NCB Lawsuit").

16

63.    In 2001, Kampel testified during a hearing in the NCB Lawsuit that Gordon Brothers Capital and Cerberus had arranged a sale of Winterland. Prior to this time, neither Lapides nor any other principal of Winterland, Transcolor, or MML were aware of this sale.

64.    On June 13, 2003, judgment was entered against Mr. Lapides in the NCB Lawsuit, and he was found to be individually liable to the Senior Note Holders for $7 million.

65.    In addition, over the years, Mr. Lapides and his wife, Pamela Lapides, had made several loans to MML totaling approximately $3 million, which, in turn, loaned those monies to Transcolor. Because Transcolor is now in bankruptcy, Mr. Lapides and his wife have not been repaid the monies they lent Transcolor through MML

66.    Also, on or about May 24, 1999, a subsidiary of LaSalle Bank of Chicago ("LaSalle"), made a loan to Valley Rivet. On December 2, 2000, Valley Rivet informed LaSalle that its inventory had been overstated, and in response, LaSalle notified Valley Rivet that Valley Rivet was in default on its loan. As a result, LaSalle attempted to foist on Valley Rivet a plan whereby Valley Rivet would have to sell all of its assets to another client of LaSalle and eliminate Valley Rivets obligations to its creditors. On information and belief, LaSalle would not have undertaken this course of action absent the above-described actions by Cerberus and Gordon Brothers Capital because, as a result of these actions, LaSalle understood that Transcolor would not be able to repay the $3 million that Valley Rivet had loaned to Transcolor (due to its bankruptcy) and perceived Valley Rivet's management team (which significantly overlapped with that of Transcolor and Winterland) to be in a compromised position.

67.    To protect Valley Rivet, Morton Lapides and Pamela Lapides loaned $750,000 to the company.

68.    Rather than be coerced into this financially irresponsible plan, in early December 2000, Valley Rivet petitioned for bankruptcy protection. The liquidation of Valley Rivet's assets

17

pursuant to that bankruptcy was completed in 2002. As a result of the bankruptcy, the $750,000 loaned by Morton Lapides and Pamela Lapides was lost.

69.     Because of the above-described actions, VR Holdings was destroyed financially and was unable to make the $80 million donation to The Cancer Foundation, Inc. that had been promised.

COUNT I
(Fraudulent Concealment)

70.     Paragraphs 1-69 are re-alleged, re-affirmed, and incorporated herein by reference.

71.     During the course of their relationship, Defendants Cerberus, Gordon Brothers, Feinberg, and Feder fraudulently concealed from Plaintiffs Lapides, Transcolor, and MML their agreement with Kampel to undermine Winterlands' business so that they could take over the ownership of Winterland and their agreement to sell Winterland.

72.     The concealment of the existence of this improper agreement with Kampel and agreement to sell Winterland were material facts upon which Plaintiffs Lapides, Transcolor, and MML relied in continuing to do business with Cerberus, Gordon Brothers, Feinberg, and Feder, failing to seek alternative sources of financing for Winterland, and negotiating with Cerberus, Gordon Brothers, Feinberg, and Feder.

73.     Defendants Cerberus, Gordon Brothers, Feinberg, and Feder had a duty to disclose this information and/or to not conceal the existence of these agreements because this is the type of information that in good conscience should be disclosed.

74.     Defendants Cerberus, Gordon Brothers, Feinberg, and Feder intended that Plaintiffs Lapides, Transcolor, and MML would rely on their concealment of these material facts.

75.     Plaintiffs Lapides, Transcolor, and MML did so rely, and have been damaged as a proximate result because, among other things: (1) Plaintiffs Morton Lapides, Transcolor, and

18

MML lost control over and their interest in Winterland and Winterland was forced into bankruptcy; (2) with Winterland in bankruptcy, Transcolor, too, was forced into bankruptcy because Winterland ceased paying under its leases with Transcolor; (3) with Transcolor in bankruptcy, Morton Lapides and Pamela Lapides have not been and will never be repaid the monies loaned to Transcolor; (4) as a proximate result of Transcolor being forced into bankruptcy, Plaintiff Morton Lapides has been found personally liable to the Senior Note Holders for $7 million; (5) as a proximate result of Transcolor being forced into bankruptcy, Valley Rivet, too, was forced to seek bankruptcy protection when it became clear that Transcolor would not repay the $3 million that Valley Rivet had loaned it; (6) as a result of Valley Rivet's bankruptcy, Morton Lapides and Pamela Lapides lost the money ($750,000) that had been loaned to Valley Rivet; and (7) The Cancer Foundation lost the $80 million donation promised to it by VR Holdings.

## COUNT II
### (Breach of Contract)

76.     Paragraphs 1-75 are re-alleged, re-affirmed, and incorporated herein by reference.

77.     On April 11, 1997, Gordon Brothers Capital and Cerberus entered into the Shareholder Agreement whereby (1) Cerberus and Gordon Brothers Capital became the 80% owners of Winterland; (2) MML was relegated to a 20% owner of Winterland; (3) MML agreed to dismiss its lawsuit against Kampel; (4) Cerberus and Gordon Brothers Capital agreed to not re-hire Kampel; (5) Cerberus and Gordon Bothers agreed to provide an additional year of financing to Winterland; and (6) MML had one year to pay off the remainder of the loan made by Cerberus and Gordon Brothers Capital and repurchase the Winterland stock.

78.     A material implied covenant of the Shareholder Agreement was that Cerberus and Gordon Brothers Capital would not interfere with Winterland's operations for one year. Evidence of this implied covenant is the fact that Gordon Brothers Capital and Cerberus agreed to provide MML with one year to pay off the remainder of the loan made by Cerberus and Gordon Brothers

Capital and repurchase the Winterland stock; Gordon Brothers Capital and Cerberus caused

Transcolor's leases with Winterland to be extended for another year; and Gordon Brothers Capital

and Cerberus caused the employment contracts of Mr. Lapides and his Assistant to be extended for

one year.

79.     In breach of this implied term, on August 8, 1997, Gordon Brothers Capital and

Cerberus placed Winterland in bankruptcy.

80.     Plaintiffs have been damaged as a proximate result of this breach because, among

other things: (1) Plaintiffs Morton Lapides, Transcolor, and MML lost control over and their

interest in Winterland and Winterland was forced into bankruptcy; (2) with Winterland in

bankruptcy, Transcolor, too, was forced into bankruptcy because Winterland ceased paying under

its leases with Transcolor; (3) with Transcolor in bankruptcy, Morton Lapides and Pamela Lapides

have not been and will never be repaid the monies loaned to Transcolor; (4) as a proximate result

of Transcolor being forced into bankruptcy, Plaintiff Morton Lapides has been found personally

liable to the Senior Note Holders for $7 million; (5) as a proximate result of Transcolor being

forced into bankruptcy, Valley Rivet, too, was forced to seek bankruptcy protection when it

became clear that Transcolor would not repay the $3 million that Valley Rivet had loaned it; and

(6) as a result of Valley Rivet's bankruptcy, Morton Lapides and Pamela Lapides lost the money

($750,000) that had been loaned to Valley Rivet.

81.     In addition, the Senior Note Holder Plaintiffs have been damaged because as a

result of Transcolor's bankruptcy, their Senior Notes are essentially worthless.

## COUNT III
### (Civil RICO)

82.     Paragraphs 1-81 are re-alleged, re-affirmed, and incorporated herein by reference.

83.     Defendants Steven Feinberg and Warren Feder are "persons" as that term is used in

18 USC § 1961(3).

84.     As part of the conspiracy described herein between Defendants and Kampel to defraud Plaintiffs Lapides, Transcolor, and MML and wrest control of Winterland from MML, Defendants Feinberg and Feder engaged in "racketeering activity" as that term is used 18 USC § 1961(1)(a) by making false claims in wire communications and by use of the U.S. Mail pertaining to such issues as their intent with regard to Winterland, their intent to place Winterland in bankruptcy rather that maintain it as a viable concern, their intent to allow Plaintiffs Morton Lapides and MML to repay the remaining balance on the funds loaned by Cerberus and Gordon Brothers, and their intent to sell Winterland.

85.     By engaging in the fraudulent activity described above, Defendants Feder and Feinberg established Cerberus and Gordon Brothers, corporate entities separate and distinct from themselves, as "enterprises" as that term is used in 18 USC § 1961(4).

86.     Defendants have committed more than two acts of racketeering activity within the last ten years and have therefore engaged in a pattern of racketeering activity as that term is defined in 18 USC § 1961(5).

87.     The activities of Feder's and Feinberg's respective enterprise affect interstate commerce.

88.     By establishing their respective enterprises and engaging through them in a pattern of racketeering activities which affect interstate commerce, defendants have violated 18 USC § 1962(C).

89.     Plaintiffs have been damaged as a proximate result of this pattern of racketeering activity because, among other things: (1) Plaintiffs Lapides, Transcolor, and MML lost control over and their interest in Winterland and Winterland was forced into bankruptcy; (2) because Winterland was forced into bankruptcy, Transcolor, too, was forced into bankruptcy because Winterland ceased paying under its leases with Transcolor; (3) with Transcolor in bankruptcy, the

21

Lapides have and will never be repaid the monies loaned to Transcolor; (4) as a proximate result of Transcolor being forced into bankruptcy, Plaintiff Morton Lapides has been found personally liable to the Senior Note Holders for $7 million; (5) as a proximate result of Transcolor being forced into bankruptcy, Valley Rivet, too, was forced to seek bankruptcy protection when it became clear that Transcolor would not repay the $3 million that Valley Rivet had loaned it; (6) as a result of Valley Rivet's bankruptcy, Morton Lapides and Pamela Lapides lost the money ($750,000) that had been loaned to Valley Rivet; and (7) The Cancer Foundation lost the $80 million donation promised to it by VR Holdings.

89.     In addition, the Senior Note Holder Plaintiffs have been damaged because as a result of Transcolor's bankruptcy, their Senior Notes are essentially worthless.

COUNT IV
(Conspiracy To Engage In A Pattern Of Racketeering Enterprise)

90.     Paragraphs 1-89 are re-alleged, re-affirmed, and incorporated herein by reference.

91.     By jointly planning and committing the acts descried above, Defendants Steven Feinberg and Warren Feder have conspired to establish an enterprise and to engage in a pattern of racketeering activity through it in violation of 18 USC § 1962(d).

92.     By conspiring to establish an enterprise that has engaged in a pattern of racketeering activity in interstate commerce by committing the various racketeering acts described above, Plaintiffs have been damaged, among other things: (1) Plaintiffs Lapides, Transcolor, and MML lost control over and their interest in Winterland and Winterland was forced into bankruptcy; (2) because Winterland was forced into bankruptcy, Transcolor, too, was forced into bankruptcy because Winterland ceased paying under its leases with Transcolor; (3) with Transcolor in bankruptcy, the Lapides have and will never be repaid the monies loaned to Transcolor; (4) as a proximate result of Transcolor being forced into bankruptcy, Plaintiff Morton Lapides has been found personally liable to the Senior Note Holders for $7 million; (5) as a proximate result of

Transcolor being forced into bankruptcy, Valley Rivet, too, was forced to seek bankruptcy protection when it became clear that Transcolor would not repay the $3 million that Valley Rivet had loaned it; (6) as a result of Valley Rivet's bankruptcy, Morton Lapides and Pamela Lapides lost the money ($750,000) that had been loaned to Valley Rivet; and (7) The Cancer Foundation lost the $80 million donation promised to it by VR Holdings.

93. In addition, the Senior Note Holder Plaintiffs have been damaged because as a result of Transcolor's bankruptcy, their Senior Notes are essentially worthless.

COUNT V

(Tortious Interference with an Economic Relationship)

94. Paragraphs 1-93 are re-alleged, re-affirmed, and incorporated herein by reference.

95. Plaintiffs Lapides, Transcolor, and MML had an economic right or benefit to own, control, and operate Winterland.

96. Defendants had knowledge of this economic benefit or right.

97. Defendants wrongfully interfered and damaged this economic benefit or relationship through their improper agreement and conspiracy with Kampel, which allowed Defendants Cerberus and Gordon Brothers Capital to take over the ownership of Winterland.

98. As a direct and proximate result of this interference, Plaintiffs Lapides, Transcolor, and MML have been injured, and since this interference was intentional, willful, wanton, and/or made with a reckless disregard for Plaintiffs Morton Lapides, Transcolor, and MML's rights, Plaintiffs are entitled to and are seeking and punitive damages.

**WHEREFORE,** Plaintiffs demand compensatory damages in an amount to be proven at trial, but which is at a minimum $1,500,000,000.00, exemplary damages in the amount of $500,000,000.00, attorneys' fees, and such other relief as to the Court appears just and proper.

23

Respectfully submitted,

KENNETH SULLIVAN
Kenneth M. Sullivan & Associates, LLC
30 North LaSalle Street, Suite 2900
Chicago, Illinois 60602


Of counsel:

Michael P. Coyle, Esq.
THE LAW OFFICES OF MICHAEL P. COYLE
9650 Santiago Road, Suite 8
Columbia, MD 21045

Richard Chaifetz
RICHARD CHAIFETZ, P.C
9650 Santiago Road, Suite 8
Columbia, MD 21045

Attorneys for Plaintiffs


DATED:       July 23 2007

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial in this matter.

Kenneth Sullivan