## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| THE CANCER FOUNDATION. INC., ET.AL.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No.  **07 C 4120** |
| | ) | |
| CERBERUS CAPITAL | ) | Honorable Judge Joan Lefkow |
| MANAGEMENT, LP, ET.AL., | ) | |
| | ) | Honorable Magistrate Judge Keys |
| *Defendants*. | ) | |

### AMENDED COMPLAINT

NOW COMES twenty-eight Plaintiffs, being part of 2,500 claimants, and in support of their claims in this matter, allege as follows:

### Jurisdiction

1.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the RICO claim alleged in Count III is based on a federal statute.  This Court has pendant jurisdiction over the claims asserted in Counts I, II, IV, V, and VI under 28 U.S.C. § 1367.

### Venue

2.     Venue is proper in this District pursuant to 28 U.S.C. 1391(a)(3) because at least one of the Defendants is subject to the personal jurisdiction of the State of Illinois.

### Parties

3.     Plaintiffs Charles Amera, Anne Amera, Sharon Boerger, Dorothy Brooks, Ms. Sue Burmester, Larry Feine, Gilbert Graham, Nancy L. Graham, James E. Heitkamp, Michael J. Heitkamp, Virginia Heitkamp Holland,  Eugene M. Hitchcock, Florence E. Hitchcock,  Robert Hummel, Kenneth L. Kluesner, Vernon  Lyons, Ruth Lyons, Cecil E. Metz, Marilyn J. Munz, Anthony Spina, Anita Spina are holders of Senior Secured Notes that were originally issued by Plaintiff Alleco, Inc. (the "Senior Notes"), but upon which Plaintiff Transcolor Corp.

("Transcolor") eventually became jointly and severally liable (the "Senior Note Holder Plaintiffs").

4.      Plaintiff The Cancer Foundation, Inc. is a 501(c)(3) organization that is involved in raising funds to promote the use of alternative medicine concurrently with conventional remedies to treat and cure cancers.

5.      Plaintiff MML, Inc. is a corporate entity operating in the State of Maryland. At all times relevant, MML, Inc. was the parent of Plaintiff Transcolor.

6.      Plaintiff Valley Rivet is a corporate entity that at all times relevant, operated in the State of Illinois, and during certain times relevant was a subsidiary of Plaintiff Transcolor.

7.      Plaintiff VR Holdings is a corporate entity that during the course of events described hereafter became the parent of MML, Inc. and Valley Rivet.

8.      Plaintiff Transcolor is a corporate entity operating in the State of Maryland. At certain times relevant, Transcolor was the parent of Valley Rivet.

9.      Plaintiff Morton M. Lapides, Sr. ("Lapides") is an individual residing in the State of Maryland. During all times relevant, Lapides held an ownership interest in Alleco, MML. Inc., Valley Rivet, VR Holdings, and Transcolor.

10.     Defendant Gordon Brothers Group is a company that operates in, among other states, Illinois. Gordon Brothers's main offices are located in Boston, Massachusetts. On information and belief, Gordon Brothers Group succeeded to the interests and liabilities of an entity known as Gordon Brothers Capital Corporation ("GBCC"). As the successor to GBCC, Gordon Brothers Group is liable for the damages alleged herein caused by GBCC.

11.     Defendant Cerberus Capital Management, LP ("Cerberus") is a company that operates and has offices in, among other states, Illinois. Cerberus's main offices are located in New York, New York.

2

12.    Defendant Madeleine, LLC is an entity that was created by Defendant Cerberus to issue, among other financial instruments, the short-term line of credit underlying this suit.

13.    Defendant Warren Feder is an individual who, at all times relevant, was the President of GBCC.  Upon information and belief, Feder is a resident of the State of New York.

14.    Defendant Stephen A. Feinberg is an individual who, at all times relevant, was the President of Defendant Cerberus.  Upon information and belief, Feinberg is a resident of the State of New York.

15.    Defendant Third Avenue Value Fund ("Third Avenue") is a company that operates in, among other states, Illinois.  Third Avenue's main offices are located in New York, New York.

16.    Defendant Martin J. Whitman is an individual who, at all times relevant, was the President of Defendant Third Avenue.  Upon information and belief, Whitman is a resident of the State of New York.

### Facts Common to All Counts

17.    Carl Kampel ("Kampel") is an individual who, at all times relevant, was the Chief Financial Officer of Winterland Concessions Company ("Winterland") and a member of its Board of Directors.

18.    John Woods ("Woods") is an individual who, at all times relevant, was an attorney and general counsel to Winterland.

19.    Transcolor is a company that, at one time, printed and sold screen-printed shirts.

20.    Transcolor's shirts were produced at two plants, one located in Commerce City, California, and a second in Albany, Georgia.

21.    In 1995, Transcolor agreed to be jointly and severally liable on the Senior Notes, valued at $6.7 Million and issued by Alleco.  Alleco was a separate subsidiary of MML, Inc.

22.    From 1994 through 1996, Transcolor began to lose significant business because

3

many of its customers were installing their own printing presses. As a result, Transcolor's two plants were operating at approximately 20% of their capacity.

**The Purchase of Winterland and Defendants' Short-Term Line of Credit**

23.     At one time, Winterland held approximately 300 licenses that allowed it to print images on tee shirts authorized by numerous significant entertainers and sold at concerts and other locations. Winterland also owned various "Rock" memorabilia valued at approximately $100 Million.

24.     Winterland's primary plant was located in San Francisco, California. In 1996, it was discovered that the plant contained a significant amount of asbestos. Rather than relocate and/or construct a new plant, Winterland's parent, Music Corporation of America ("MCA") and MCA's parent Seagrams determined to sell Winterland.

25.     On or about March 1996, MML, Inc., the parent of Transcolor, began negotiations with MCA to purchase Winterland. The purchase of Winterland would be extremely lucrative for Transcolor because while its business was declining for the above-described reasons, its two plants were capable of printing at very high volumes. In addition, its Albany, Georgia plant would allow the company to realize significant savings when selling shirts on the East coast.

26.     MML, Inc. intended to purchase Winterland through a six-month term bridge loan and then consolidate Winterland with Transcolor. MML Inc.'s purchase of Winterland was completed in August 1996.

27.     At the time of the aforementioned transaction, Valley Rivet was a subsidiary of Transcolor. In 1995, Valley Rivet loaned Transcolor approximately $3 million.

28.     As part of MML, Inc.'s purchase of Winterland, Transcolor sold its inventory and leased its buildings and machinery to Winterland. Transcolor's only remaining assets were Valley Rivet and its leases with Winterland. However, said leases were expected to generate for Transcolor

4

approximately $1.4 Million annually over a ten-year period.

29.     As a result, Transcolor was therefore converted from an entity that was losing approximately $3 Million per year (excluding Valley Rivet's earnings) to a highly profitable enterprise.

30.     On or before August 14, 1996, MML, Inc. and Kampel agreed to have Kampel join Winterland as its Chief Financial Officer and a member of its Board of Directors.

31.     Kampel began his employment with Winterland on August 26, 1996.

32.     On August 14, 1996, GBCC and Cerberus, through its affiliate, Madeleine, LLC, agreed to extend to Winterland a $23 Million short-term line of credit due in February 1997, with additional exit fees to be paid in the amount of $4.5 Million.  The line of credit transaction was secured by Winterland's receivables, inventory, fixed assets, artist licenses, 100% of Winterland's stock (which before reserves and forgiven notes, had a value of $69 million), and guarantees from Lapides and MML, Inc.

**GBCC and Cerberus Conspire with Kampel**

33.     Beginning in the Fall of 1996, Kampel made several trips between Winterland's Linthicum, Maryland offices, where Kampel was based, and Winterland's headquarters in San Francisco, California.

34.     On at least two of these aforementioned trips, Kampel met with Defendant Feder, the President of GBCC, who was evaluating Winterland on behalf of GBCC and Cerberus.

35.     By late Fall of 1996, as a result of Kampel's dealings with Feder, Kampel had become hostile to Lapides and other members of Winterland's management.  At this time, Kampel also became aware of Feder's interest in taking over Winterland.

36.     In late November or early December 1996, with the unpaid portions of the line of credit extended by GBCC, Cerberus and Madeleine, LLC coming due in February 1997, Winterland's financial situation became precarious, despite repaying $10 million of the credit line from continuing

operations.

37.     Sometime between November 1996 and January 1997, Kampel, in violation of his contractual and fiduciary duties as an officer and director of Winterland, schemed to secretly assist GBCC and Cerberus in wresting control and ownership of Winterland from MML, Inc. and personally acquire an equity position in Winterland.   Defendants Third Avenue and Whitman participated in said scheme with Feder and  Feinberg.

38.     In December 1996, Winterland's relationship with some of its suppliers deteriorated. A long-term line of credit was needed in order to keep Winterland operating.   Accordingly, Winterland management aggressively sought to secure long-term financing to satisfy the aforementioned short-term line of credit with Defendants GBCC, Cerberus and Madeleine, LLC.

39.     In furtherance of the aforementioned scheme, Kampel's conduct prevented Winterland from obtaining refinancing of the aforementioned short-term line of credit in order to force Winterland to sell to GBCC and Cerberus.  These "new" owners would then convey personal benefits to Kampel. This conduct was directed and approved by GBCC, Cerberus, Madeleine, LLC, Third Avenue, Feder, Feinberg, and Whitman as part of their conspiracy to obtain Winterland.

40.     Kampel refused to pursue each potential source of long-term financing, or evaluated the source in such bad faith, the option was not pursued.

41.     Kampel systematically disobeyed directives from Lapides and other Winterland management to thwart Winterland's efforts to secure needed long-term working capital.

42.     Kampel improperly engaged in the foregoing conspiracy to promote his personal interests and those of GBCC, Cerberus and Third Avenue.

43.     Specifically, Kampel secretly entered into an agreement with Feder and Feinberg that if GBCC took over Winterland, Kampel would continue as Chief Financial Officer and personally receive Winterland stock for an investment of $50,000.

44.     On or about January 3, 1997, Feder approached Kampel and agreed to extend the due date of the short-term line of credit if GBCC and Cerberus assumed a majority interest in Winterland and relegated MML, Inc. to a non-controlling minority status.

45.     GBCC's ultimate intent to take over Winterland was concealed from Lapedis and Winterland management until an article appeared in the July 3, 2006 issue of Forbes magazine which allowed Lapides to uncover the aforementioned scheme. Specifically, Lapides learned that Defendant Whitman had determined in 1997 that Third Avenue should begin investing in and taking over "small cap" companies. As a result of this article and the meetings that had taken place with Whitman and Feder in 1997 related to Winterland, Plaintiffs were able to piece together, for the first time, Third Avenue's involvement in Defendants GBCC and Cerberus's conspiracy to take over Winterland.

**Capital Factors's Agreement Is Thwarted by Conspiracy**

46.     Concurrently, and despite Kampel's conspiratorial conduct, Winterland entered into an agreement with Capital Factors, Inc. to provide a $1 Million factor guaranty and/or letter of credit that would allow Winterland to continue to purchase from suppliers. Capital Factors also issued a letter of intent to provide Winterland with receivable-based financing for the purpose of replacing Winterland's line of credit with GBCC.

47.     In late February 1997, Feder orally exposed the conspiracy by informing Capital Factors that Kampel was on GBCC's "team."

48.     As a result, Capital Factors concluded that there was a battle for control of Winterland and decided not to replace Winterland's short-term line of credit with GBCC, Cerberus and Madeleine, LLC.

49.     Concurrently, while not being privy to the established conspiracy, Kampel was ordered by Winterland management to negotiate alternative long-term financing with Defendants

GBCC, Cerberus, and Third Avenue. Third Avenue was introduced to Winterland as an alternative lender—not an entity interested in a take over of Winterland. Winterland management told Kampel that before he agreed to accept any alternative long-term financing from GBCC and Cerberus, which would result in MML, Inc. losing control of Winterland, Winterland would need sufficient notice to secure long-term financing from another source.

50. Kampel disobeyed Winterland management's order and entered into an agreement calling for a March 15, 1997 closing date with GBCC and Cerberus, foreclosing alternative long-term financing with a third party due to the lack of time needed to perform pre-financing due diligence activities.

51. This action was another act in furtherance of the conspiracy to prevent Winterland from obtaining financing independent of GBCC and Cerberus, forcing a takeover.

52. Winterland's inability to obtain long-term financing from Capital Factors, or any other source, was the proximate result of Kampel's wrongful actions in furtherance of the conspiracy to strangle Winterland financially knowing that the short-term line of credit would come due in February 1997.

**Kampel Exposed**

53. In late February 1997, Lapides and Woods learned from Capital Factors that Kampel and Feder (representing the lenders) had arrived at some sort of agreement. On March 4, 1997, Lapides and Woods confronted Kampel and asked him if he was cooperating with GBCC and Cerberus to takeover Winterland. Kampel confessed that he and Feder had agreed that if Winterland were taken over by GBCC, Kampel would receive Winterland stock on favorable terms not generally available to others.

54. As a result of the March 4 meeting and Kampel's confession to acts of disloyalty and self-dealing, Kampel was removed from Winterland's Board of Directors. By letter dated March 6,

1997, Kampel was barred from entering Winterland's premises or contacting any of its employees.

**The "Domino Effect" of the Conspiracy to Take Over Winterland**

55.    Winterland's difficulties with suppliers continued.  One supplier, Springford Mills, which provided blank tee shirts for Winterland's Tommy Hilfiger contract, contacted Kampel on March 5, 1997 to inquire about Winterland's financial status.

56.    Kampel responded that he was not at liberty to discuss such matters, and directed representative Mark Smith to Woods, Winterland's General Counsel.

57.    Kampel repeated the aforementioned response to similar supplier inquiries. This was contrary to Kampel's prior practice and undertaken without consulting Woods for the unlawful purpose of weakening Winterland's financial position.

58.    Woods was subsequently blind-sided by a telephone call from an executive of Sun Trust Bank, a financial source of another Winterland supplier.  The unexplained and extraordinary referral to Winterland's General Counsel caused all of Winterland's suppliers to conclude that Winterland was on the verge of bankruptcy, making said suppliers even more reluctant to supply on credit as they had in the past.

**Kampel Causes Winterland to Default in Furtherance of the Conspiracy**

59.    GBCC and Cerberus notified Winterland that it was in default on the credit line for failing to provide monthly and year-to-date financial statements certified by the Chief Financial Officer, i.e. Kampel.

60.    Under the credit line agreement with GBCC and Cerberus, Winterland was required to provide CFO-certified financials within 30 days of the end of each month, covering the prior month and year-to-date.

61.    Woods questioned Kampel as to whether the default allegation was true, and Kampel admitted that he had not provided GBCC, Cerberus, and Madeleine, LLC with any financials after

November 1996.

62. MML, Inc. subsequently filed suit against Kampel alleging breach of fiduciary duty and related counts seeking recovery of the damage Kampel had caused to Winterland.

**Shareholder and Settlement Agreement**

63. On April 11, 1997, GBCC and Cerberus (through Madeleine, LLC) entered into a Shareholder and Settlement Agreement (the "Shareholder Agreement") whereby:

(1) GBCC and Cerberus became 80% owners of Winterland and MML, Inc. was relegated to a 20% ownership of Winterland;

(2) MML, Inc. agreed to dismiss its lawsuit against Kampel;

(3) GBCC and Cerberus agreed to not re-hire Kampel;

(4) GBCC and Cerberus agreed to extend the maturity dates for the short-term line of credit by twenty-four months from the Agreement execution date;

(5) For a one year period extending from April 11, 1997 to April 10, 1998 (the "Refinancing Period"), GBCC and Cerberus agreed to consider in good faith any offer by MML, Inc. or any entity proposed by MML, Inc. to repurchase the stock that was being transferred to GBCC and Cerberus;

(6) During the Refinancing Period, if GBCC or Cerberus received an offer for the shares subject to this agreement, Lapides and MML, Inc. would be given the right of first refusal at the offered price;

(7) The parties agreed that each "shall do and perform or cause to be done and performed all such further acts and things and shall execute and deliver all such other agreements, certificates, instruments, and documents as any other party hereto reasonably may request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby;"

and

> (8)    A material implied covenant that GBCC and Cerberus would not interfere with Winterland's operations for one year.

64.    Plaintiff Lapides was named Vice Chairman of Winterland during the Refinancing Period.

**GBCC and Cerberus's Breach of the Shareholder and Settlement Agreement**

65.    On August 8, 1997, GBCC and Cerberus placed Winterland into bankruptcy, which was in breach of the Shareholder Agreement, which required GBCC and Cerberus not to interfere with Winterland's operations for one year.

66.    Accordingly, Winterland was no longer required to make payments under the Transcolor leases, causing Transcolor to lose $14 Million annually.  As the lease payments were Transcolor's only source of revenue, it could no longer continue to operate.

67.    In 1998, National City Bank ("NCB"), the Indenture Trustee of the 1993 Trust Indenture and the Supplemental Trust Indenture for the Senior Secured Notes, petitioned to place Transcolor in bankruptcy.  The approximately $7 Million in Senior Notes for which Transcolor was jointly and severally responsible with Alleco were now in default.

68.    On August 13, 1999, NCB filed suit in the United States District Court for the District of Maryland against Lapides, Transcolor, and Alleco, alleging malfeasance that harmed the Senior Note Holders (the "NCB Lawsuit").

69.    Winterland was discharged from bankruptcy on or about July 5, 2000, and the Transcolor leases were formally terminated.

70.    In 2001, Kampel testified in the NCB Lawsuit that he, GBCC, and Cerberus had arranged a sale of Winterland.  Lapides nor any other principal of Winterland, Transcolor, or MML, Inc. were previously aware of this arranged sale.

11

**GBCC and Cerberus Place Winterland in Second Bankruptcy**

71.     On January 2, 2001, as part of their continuing conspiracy to control Winterland, GBCC and Cerberus again placed Winterland in Bankruptcy (the "Second Winterland Bankruptcy").

72.     On or about January 18, 2007, the Bankruptcy Court in the Second Winterland Bankruptcy approved the sale of substantially all of Winterland's assets by GBCC and Cerberus to Signatures Network of San Francisco.

**Plaintiffs' Damages**

73.     Valley Rivet defaulted on a loan from LaSalle Bank made in May 1999 as a result of the above-described actions by GBCC and Cerberus. Specifically, Transcolor was not able to repay the $3 Million that Valley Rivet loaned Transcolor and LaSalle perceived Valley Rivet's management team to be in a compromised position.

74.     As a result of Valley Rivet's default position, Lapides was forced to loan $750,000 to Valley Rivet.

75.     In early December 2000, Valley Rivet petitioned for bankruptcy protection. The liquidation of Valley Rivet's assets pursuant to that bankruptcy was completed in 2002. As a result of said bankruptcy, the $750,000 loaned by Lapides was uncollectible.

76.     On June 13, 2003, judgment was entered against Lapides in the NCB Lawsuit, and he was found to be individually liable to the Senior Note Holders for $7 Million.

77.     Lapides had made loans to MML, Inc. totaling approximately $3 Million. MML, Inc., in turn, loaned said monies to Transcolor. Because Transcolor was now bankrupt, Lapides and his wife have not been repaid the monies borrowed by Transcolor through MML, Inc.

78.     As a result of Valley Rivet's bankruptcy, VR Holdings was unable to generate the necessary profits to satisfy its pledge to donate $80 Million to the Cancer Foundation, Inc., a 501(c)(3) organization that is involved in raising funds to promote the use of alternative medicine

concurrently with conventional remedies to treat and cure cancers.

## COUNT I
## FRAUDULENT CONCEALMENT

79.     Paragraphs 1-78 are realleged, reaffirmed, and incorporated herein by reference.

80.     Beginning in 1997, Defendants GBCC, Cerberus, Madeleine, LLC, Third Avenue, Feder, Feinberg, and Whitman fraudulently concealed from Plaintiffs Third Avenue's involvement in the scheme to undermine Winterland's business and take over.

81.     The concealment of Third Avenue's involvement in this conspiracy and the steps taken to further the conspiracy were material facts upon which Plaintiffs relied in continuing to do business with Defendants GBCC, Cerberus, and Madeleine, LLC.

82.     Defendants GBCC, Cerberus, Madeleine, LLC, Third Avenue, Feder, Feinberg, and Whitman all had a duty to disclose and/or to not conceal the existence of Third Avenue's involvement in the above-described scheme.

83.     Defendants GBCC, Cerberus, Madeleine, LLC, Third Avenue, Feder, Feinberg, and Whitman intended that Plaintiffs would rely on their concealment of these material facts.

84.     In late July 2006, Lapides learned through a Forbes magazine article, dated July 3, 2006, that Defendant Whitman had determined in 1997 that Third Avenue should begin investing in and taking over "small cap" companies.  As a result of this article and the meetings that had taken place with Whitman and Feder in 1997 related to Winterland, Plaintiffs were able to piece together, for the first time, Third Avenue's involvement in the Defendants' conspiracy to take over Winterland.

85.     Plaintiffs relied on the concealment of the aforementioned material facts, and have been damaged as a proximate result because, among other things: (1) Plaintiffs Lapides, Transcolor, and MML, Inc. lost control over and their interest in Winterland and Winterland was

forced into bankruptcy; (2) with Winterland in bankruptcy, Transcolor, too, was forced into bankruptcy because Winterland ceased paying under its leases with Transcolor; (3) with Transcolor in bankruptcy, Lapides has not been and will never be repaid the monies loaned to Transcolor; (4) as a proximate result of Transcolor being forced into bankruptcy, Lapides was found personally liable to the Senior Note Holders for $7 million; (5) as a proximate result of Transcolor being forced into bankruptcy, Valley Rivet was forced to seek bankruptcy protection because Transcolor could not repay the $3 million loaned by Valley Rivet; (6) as a result of Valley Rivet's bankruptcy, Lapides lost $750,000 loaned to Valley Rivet; and (7) The Cancer Foundation did not receive the $80 million donation pledged by VR Holdings.

**WHEREFORE,** Plaintiffs demand from Defendants GBCC (formerly succeeded by Gordon Brothers Group), Cerberus, Madeleine, LLC, Third Avenue, Feder, Feinberg, and Whitman compensatory damages in an amount to be proven at trial, but which is at a minimum $500 Million, treble damages, attorneys' fees, and such other relief this Court deems just and proper.

## COUNT II
## BREACH OF CONTRACT

86.     Paragraphs 1-78 are realleged, reaffirmed, and incorporated herein by reference.

87.     On April 11, 1997, GBCC and Cerberus entered into the Shareholder Agreement whereby in return for the release of certain claims and transfer of stock GBCC and Cerberus became 80% owners of Winterland.

88.     Under Section 8.2 of the Shareholder Agreement, GBCC and Cerberus agreed to "do and perform or cause to be done and performed" any acts necessary to: (1) extend the maturity dates of the loans, made by GBCC and Cerberus through Madeleine, LLC, to Winterland by twenty-four months; (2) for a period of one year consider in good faith any offer by MML, Inc. or any entity proposed by MML, Inc. to repurchase the stock that was being transferred to GBCC and

Cerberus; (3) allow Lapides or MML, Inc. to match any offer to purchase the stock being transferred to GBCC and Cerberus; and (4) "to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated [t]hereby."

89.     In addition to its explicit terms there was embodied in the Shareholder Agreement a duty of good faith and fair dealing, which is implied in all contracts under Illinois law.

90.     On August 8, 1997, in breach of the express written terms of Section 8.2 of the Shareholder Agreement and/or the duty of good faith and fair dealing, GBCC and Cerberus placed Winterland into bankruptcy.

91.     Plaintiffs have been damaged as a proximate result because, among other things: (1) Plaintiffs Lapides, Transcolor, and MML, Inc. lost control over and their interest in Winterland and Winterland was forced into bankruptcy; (2) with Winterland in bankruptcy, Transcolor, too, was forced into bankruptcy because Winterland ceased paying under its leases with Transcolor; (3) with Transcolor in bankruptcy, Lapides has not been and will never be repaid the monies loaned to Transcolor; (4) as a proximate result of Transcolor being forced into bankruptcy, Lapides was found personally liable to the Senior Note Holders for $7 million; (5) as a proximate result of Transcolor being forced into bankruptcy, Valley Rivet was forced to seek bankruptcy protection because Transcolor could not repay the $3 million loaned by Valley Rivet; (6) as a result of Valley Rivet's bankruptcy, Lapides lost $750,000 loaned to Valley Rivet; and (7) The Cancer Foundation did not receive the $80 million donation pledged by VR Holdings.

**WHEREFORE,** Plaintiffs demand from Defendants GBCC (formerly succeeded by Gordon Brothers Group) and Cerberus compensatory damages in an amount to be proven at trial, but which is at a minimum $500 Million, and such other relief this Court deems just and proper.

## COUNT III
## CIVIL RICO

92.     Paragraphs 1-78 are realleged, reaffirmed, and incorporated herein by reference.

93.     Defendants Feder, Feinberg, and Whitman are "persons" as that term is used in 18 USC § 1961(3).

94.     Defendants Feder, Feinberg and Whitman established GBCC, Cerberus, Madeleine, LLC, and Third Avenue as corporate entities separate and distinct from themselves, as "enterprises" as that term is used in 18 USC § 1961(4).

95.     Defendants Feder, Feinberg, and Whitman have committed more than two acts of racketeering activity within the last ten years and have therefore engaged in a pattern of racketeering activity as that term is defined in 18 USC § 1961(5).

96.     The conspiracy by Defendants GBCC, Cerberus, Madeleine, LLC, Third Avenue, Feder, Feinberg, and Whitman to defraud Plaintiffs, wrest control of Winterland, and abscond with the value of its assets is "racketeering activity" as that term is used 18 USC § 1961(1)(a) by making false claims in wire communications and use of the U.S. Mail in furtherance of their intent to place Winterland into bankruptcy rather that maintain it as a viable concern, allow Plaintiffs to repay the remaining balance on the credit line loaned by GBCC and Cerberus through Madeleine, LLC, and then sell Winterland.

97.     The aforementioned racketeering activity was not completed until Winterland exited the Second Winterland Bankruptcy in January, 2007 when GBCC, Cerberus, Madeleine, LLC, Third Avenue, Feder, Feinberg, and Whitman could first realize their ill-gotten gains.

98.     The aforementioned racketeering activities of Feder, Feinberg, and Whitman, through their enterprises GBCC, Cerberus, Madeleine, LLC, and Third Avenue, affect interstate commerce.

93.     Defendants Feder, Feinberg, and Whitman's establishment of enterprises engaged

16

in a pattern of racketeering activities that affect interstate commerce violates 18 USC § 1962(C).

99.     Plaintiffs have been damaged as a proximate result because, among other things: (1) Plaintiffs Lapides, Transcolor, and MML, Inc. lost control over and their interest in Winterland and Winterland was forced into bankruptcy; (2) with Winterland in bankruptcy, Transcolor, too, was forced into bankruptcy because Winterland ceased paying under its leases with Transcolor; (3) with Transcolor in bankruptcy, Lapides has not been and will never be repaid the monies loaned to Transcolor; (4) as a proximate result of Transcolor being forced into bankruptcy, Lapides was found personally liable to the Senior Note Holders for $7 million; (5) as a proximate result of Transcolor being forced into bankruptcy, Valley Rivet was forced to seek bankruptcy protection because Transcolor could not repay the $3 million loaned by Valley Rivet; (6) as a result of Valley Rivet's bankruptcy, Lapides lost $750,000 loaned to Valley Rivet; and (7) The Cancer Foundation did not receive the $80 million donation pledged by VR Holdings.

       **WHEREFORE,** Plaintiffs demand from Defendants GBCC (formerly succeeded by Gordon Brothers Group), Cerberus, Madeleine, LLC, Third Avenue, Feder, Feinberg, and Whitman, compensatory damages in an amount to be proven at trial, but which is at a minimum $500 Million, treble damages, attorneys' fees, and such other relief this Court deems just and proper.

## COUNT IV
## CONSPIRACY TO ENGAGE IN A PATTERN OF RACKETEERING ENTERPRISE

100.     Paragraphs 1-78 are re-alleged, re-affirmed, and incorporated herein by reference.

101.     Defendants Feinberg, Feder, Whitman, GBCC, Cerberus, Madeleine, LLC and Third Avenue are "persons" as that term is used in 18 USC § 1961(3).

102.     By engaging in the fraudulent activity described above, Defendants Feder, Feinberg, and Whitman established GBCC, Cerberus, Madeleine, LLC, and Third Avenue as corporate entities separate and distinct from themselves, as "enterprises" as that term is used in 18

USC § 1961(4).

103.   Defendants Feder, Feinberg, and Whitman have committed more than two acts of racketeering activity within the last ten years and have therefore engaged in a pattern of racketeering activity as that term is defined in 18 USC § 1961(5).

104.   The conspiracy by Defendants GBCC, Cerberus, Madeleine, LLC, Third Avenue, Feder, Feinberg, and Whitman to defraud Plaintiffs, wrest control of Winterland and abscond with the value of its assets is "racketeering activity" as that term is used 18 USC § 1961(1)(a) by making false claims in wire communications and use of the U.S. Mail in furtherance of their intent to place Winterland into bankruptcy rather that maintain it as a viable concern, allow Plaintiffs to repay the remaining balance on the credit line loaned by GBCC and Cerberus through Madeleine, LLC, and then sell Winterland.

105.   The aforementioned racketeering activity was not completed until Winterland exited the Second Winterland Bankruptcy in January 2007 when GBCC, Cerberus, Madeleine, LLC, Third Avenue, Feder, Feinberg, and Whitman could first realize their ill-gotten gains.

106.   The aforementioned racketeering activities of Feder, Feinberg, Whitman and their enterprises GBCC, Cerberus, Madeleine, LLC, and Third Avenue affect interstate commerce.

107.   Defendants Feder, Feinberg, and Whitman's establishment of enterprises engaged in a pattern of racketeering activities that affect interstate commerce, violates 18 USC § 1962(C).

108.   By and through the aforementioned acts, Feder, Feinberg, Whitman, GBCC, Cerberus, Madeleine, LLC and Third Avenue intended to facilitate a scheme and conspiracy that, if completed, would satisfy the elements of RICO in violation of 18 USC § 1962(d).

109.   Through this conspiracy, Plaintiffs have been damaged as a proximate result because, among other things: (1) Plaintiffs Lapides, Transcolor, and MML, Inc. lost control over and their interest in Winterland and Winterland was forced into bankruptcy; (2) with Winterland in

bankruptcy, Transcolor, too, was forced into bankruptcy because Winterland ceased paying under its leases with Transcolor; (3) with Transcolor in bankruptcy, Lapides has not been and will never be repaid the monies loaned to Transcolor; (4) as a proximate result of Transcolor being forced into bankruptcy, Lapides was found personally liable to the Senior Note Holders for $7 million; (5) as a proximate result of Transcolor being forced into bankruptcy, Valley Rivet was forced to seek bankruptcy protection because Transcolor could not repay the $3 million loaned by Valley Rivet; (6) as a result of Valley Rivet's bankruptcy, Lapides lost $750,000 loaned to Valley Rivet; and (7) The Cancer Foundation did not receive the $80 million donation pledged by VR Holdings.

**WHEREFORE,** Plaintiffs demand from Defendants GBCC (formerly succeed by Gordon Brothers Group), Cerberus, Madeleine, LLC, Third Avenue, Feder, Feinberg, and Whitman compensatory damages in an amount to be proven at trial, but which is at a minimum $500 Million, treble damages, attorneys' fees, and such other relief as this Court deems just and proper.

## COUNT V
## TORTIOUS INTERFERENCE WITH AN ECONOMIC RELATIONSHIP

110.    Paragraphs 1-78 are realleged, reaffirmed, and incorporated herein by reference.

111.    Plaintiffs Lapides, MML, Inc., and Transcolor had an economic right or benefit to own, control, and operate Winterland.

112.    Defendants Whitman and Third Avenue had knowledge of this economic right or benefit.

113.    Defendants Whitman and Third Avenue wrongfully interfered and damaged this economic right or benefit by conspiring with Defendants Feder, Feinberg, GBCC, Cerberus, and Madeleine, LLC to take over Winterland.

114.    Plaintiffs have been damaged as a proximate result of the aforementioned interference because, among other things: (1) Plaintiffs Lapides, Transcolor, and MML, Inc. lost

19

control over and their interest in Winterland and Winterland was forced into bankruptcy; (2) with Winterland in bankruptcy, Transcolor, too, was forced into bankruptcy because Winterland ceased paying under its leases with Transcolor; (3) with Transcolor in bankruptcy, Lapides has not been and will never be repaid the monies loaned to Transcolor; (4) as a proximate result of Transcolor being forced into bankruptcy, Lapides was found personally liable to the Senior Note Holders for $7 million; (5) as a proximate result of Transcolor being forced into bankruptcy, Valley Rivet was forced to seek bankruptcy protection because Transcolor could not repay the $3 million loaned by Valley Rivet; (6) as a result of Valley Rivet's bankruptcy, Lapides lost $750,000 loaned to Valley Rivet; and (7) The Cancer Foundation did not receive the $80 million donation pledged by VR Holdings.

115.    Since the aforementioned interference was intentional, willful, wanton, and/or made with a reckless disregard for Plaintiffs' rights, Plaintiffs are entitled to and seek punitive damages.

**WHEREFORE,** Plaintiffs demand from Defendants Whitman and Third Avenue, compensatory damages in an amount to be proven at trial, but which is at a minimum $500 Million, exemplary damages in the amount of $500 Million, attorneys' fees, and such other relief as this Court deems just and proper.

## COUNT VI
## CIVIL CONSPIRACY

116.    Paragraphs 1-78 are realleged, reaffirmed, and incorporated herein by reference.

117.    Defendants Feder, Feinberg, and Whitman, individually and through GBCC, Cerberus, Madeleine, LLC and Third Avenue acted in concert with joint motive to undermine Winterland's business and take over Winterland through various tortious acts.

118.    The tortious acts that formed parts of this conspiracy included, but were not limited to, making false claims pertaining to such issues as their intent with regard to Winterland, their

intent to place Winterland in bankruptcy rather that maintain it as a viable concern, their intent to allow Plaintiffs Lapides and MML, Inc. to repay the remaining balance on the funds loaned by GBCC and Cerberus, their intent to sell Winterland, and the concealment of Third Avenue's planned purchase of Winterland.

119.     Through this conspiracy, Plaintiffs have been damaged as a proximate result because, among other things: (1) Plaintiffs Lapides, Transcolor, and MML, Inc. lost control over and their interest in Winterland and Winterland was forced into bankruptcy; (2) with Winterland in bankruptcy, Transcolor, too, was forced into bankruptcy because Winterland ceased paying under its leases with Transcolor; (3) with Transcolor in bankruptcy, Lapides has not been and will never be repaid the monies loaned to Transcolor; (4) as a proximate result of Transcolor being forced into bankruptcy, Lapides was found personally liable to the Senior Note Holders for $7 million; (5) as a proximate result of Transcolor being forced into bankruptcy, Valley Rivet was forced to seek bankruptcy protection because Transcolor could not repay the $3 million loaned by Valley Rivet; (6) as a result of Valley Rivet's bankruptcy, Lapides lost $750,000 loaned to Valley Rivet; and (7) The Cancer Foundation did not receive the $80 million donation pledged by VR Holdings.

**WHEREFORE,** Plaintiffs demand from Defendants GBCC (formerly succeeded by Gordon Brothers Group), Cerberus, Madeleine, LLC, Third Avenue, Feder, Feinberg, and Whitman compensatory damages in an amount to be proven at trial, but which is at a minimum $500 Million, attorneys' fees, and such other relief this Court deems just and proper.

Respectfully submitted,

THE CANCER FOUNDATION, INC.,
ET.AL.


By: _____/s/ Kenneth M. Sullivan
            One of Its Attorneys


Kenneth M. Sullivan
KENNETH M. SULLIVAN & ASSOCIATES, LLC
30 North LaSalle Street, Suite 2900
Chicago, Illinois 60602


Michael P. Coyle, Esq. (pro hac vice admission pending)
THE LAW OFFICES OF MICHAEL P. COYLE
9650 Santiago Road, Suite 8
Columbia, MD 21045


Richard Chaifetz
RICHARD CHAIFETZ, P.C
9650 Santiago Road, Suite 8
Columbia, MD 21045


Attorneys for Plaintiffs


DATED:        October 23, 2007

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial in this matter.

_/s/ Kenneth M. Sullivan_____