IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE CANCER FOUNDATION, INC., et al., | ) ) ) |
| Plaintiffs, | ) No. 07 CV 4120 ) |
| - against - | ) ) |
| CERBERUS CAPITAL MANAGEMENT, L.P., et al., | ) Hon. Joan H. Lefkow ) |
| Defendants. | ) ) ) |

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
JOINT CONSOLIDATED MOTION FOR SANCTIONS UNDER
RULE 11 OF THE FEDERAL RULES OF CIVIL PROCEDURE

Dated: December 3, 2007

Defendants CERBERUS CAPITAL MANAGEMENT, LP ("Cerberus"), MADELEINE, LLC ("Madeleine") and STEPHEN A. FEINBERG ("Feinberg") (collectively, the "Cerberus Defendants"), through their attorneys Schulte Roth & Zabel LLP, and Defendants GORDON BROTHERS GROUP ("Gordon Bros.") and WARREN FEDER ("Feder") (collectively, the "Gordon Bros. Defendants") (collectively with the Cerberus Defendants, the "Defendants"), through their attorneys Latham & Watkins LLP, respectfully submit this Memorandum of Law in support of their consolidated motion for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure ("Rule 11").

## PRELIMINARY STATEMENT

Plaintiffs, through their counsel, Kenneth M. Sullivan of Chicago, Illinois, and Michael P. Coyle and Richard Chaifetz[1] of Columbia, Maryland, filed two frivolous complaints with this Court (the "Original Complaint" and the "Amended Complaint," collectively, the "Complaints"). The substantive allegations of the Complaints are baseless and will be vigorously defended if this case proceeds. But, merits and pleading infirmities aside, even a cursory reading of either of the Complaints makes plain that, based on their own allegations, Plaintiffs were on notice of all their claims more than a decade ago and, thus, all the causes of action are hopelessly time-barred and should never have been brought. Plaintiffs' counsel should have been aware that the claims and legal contentions in both Complaints were not warranted by existing law or by any nonfrivolous argument for a change in the law. Accordingly, Defendants respectfully request the Court to sanction Plaintiffs and their counsel pursuant to Rule 11.

---

[1] On November 30, 2007, the Court granted Plaintiffs' Counsel's Emergency Motion For Leave to Accelerate Motion To Withdraw As Counsel For Plaintiffs and their Motion to Withdraw As Counsel without prejudice to this Joint Consolidated Rule 11 Motion. Thus, even though Mssrs. Sullivan, Chaifetz and Coyle are no longer counsel to Plaintiffs, they remain liable pursuant to Rule 11 and for the purposes of this Motion shall be referred to as "Plaintiffs' Counsel," even though they are effectively withdrawn for the remainder of this litigation.

## **STATEMENT OF FACTS**

According to the Complaints, Plaintiffs' woes began in early 1996, when Plaintiff MML, Inc. ("MML"), through the efforts of Plaintiff Morton M. Lapides, Sr. ("Lapides"), sought to buy Winterland Concessions Company ("Winterland"). (Compl. ¶ 22; Am. Compl. ¶ 25.) Lapides financed the purchase with a short-term loan (the "Financing") from a corporate predecessor to Gordon Bros., Gordon Brothers Capital Corporation ("GBCC"), and Cerberus, through its affiliate Madeleine. (Compl. ¶ 23; Am. Compl. ¶ 26.)

By January 1997, Winterland defaulted on its obligations to GBCC and Cerberus, but Feder, on behalf of the Defendants, agreed to extend the due date on the Financing if GBCC and Cerberus assumed a majority stake in Winterland. (Compl. ¶ 36; Am. Compl. ¶ 44.) On April 11, 1997, Lapides, MML, GBCC and Cerberus entered into a shareholder and settlement agreement (the "Shareholder Agreement") which, among other things, gave GBCC and Cerberus an 80% ownership interest in Winterland in exchange for a one-year extension on the Financing. (Compl. ¶ 54; Am. Compl. ¶ 63.) Winterland, however, continued to experience significant financial difficulties (Compl. ¶¶ 48-49; Am. Compl. ¶¶ 55-58) and ultimately filed for bankruptcy on August 8, 1997. (Compl. ¶ 57; Am. Compl. ¶ 65.)

### **Plaintiffs Plead Discovery of the Alleged Conspiracy as Early as 1997**

Despite Winterland's considerable and undisputed business problems, Plaintiffs claim that the bankruptcy filing was purely the result of an alleged conspiracy among Defendants and Carl Kampel ("Kampel"), Winterland's Chief Financial Officer. (Compl. ¶ 27; Am. Compl. ¶ 17.) Plaintiffs assert that GBCC and Cerberus conspired with Kampel to improperly gain control of Winterland. The Complaints allege that Plaintiffs had actual knowledge of the alleged conspiracy as early as 1997 and no later than 2001.

2

According to the Complaints, the alleged conspiracy began "by late Fall of 1996," when Kampel became openly hostile to Lapides and allegedly learned of Feder's interest in ownership of Winterland. (Compl. ¶ 31; Am. Compl. ¶ 35.) "Sometime between November 1996 and January 1997, Kampel," as an officer and director of Winterland, "schemed to secretly assist GBCC and Cerberus in wresting control and ownership of Winterland from MML" by preventing Winterland from obtaining refinancing of the Financing, thereby forcing the eventual sale of Winterland. (Am. Compl. ¶¶ 37, 39; *see also* Compl. ¶¶ 33, 34, 37.)

Additionally, "beginning in November, 1996 and continuing through March 1997, Kampel *frequently disobeyed direct orders* from Lapides and other Winterland management to pursue and follow up with certain financing opportunities that would otherwise have provided Winterland with necessary working capital." (Compl. ¶ 35; *see also* Am. Compl. ¶¶ 40, 41) (emphasis added). Specifically, the Complaints allege that in February 1997, during negotiations to obtain potential financing from GBCC and Defendant Third Avenue Value Fund ("Third Avenue"), a third lender that would have replaced Cerberus, Kampel ignored an "explicit order" from Lapides to provide Winterland "30 days to find financing from another source" before accepting any financing from GBCC and Cerberus. (Compl. ¶ 44; *see also* Am. Compl. ¶ 49.)

In addition to Kampel's repeated insubordination, the Complaints also allege that on March 4, 1997, Lapides and John Woods, general counsel for Winterland, "*confronted* Kampel" about whether "he was cooperating with [GBCC] and Cerberus to accomplish the takeover of Winterland," to which "Kampel *confessed* to Lapides and Woods that he and Warren Feder had agreed that if Winterland was taken over by [GBCC], Kampel would receive a significant amount of stock in the company." (Compl. ¶ 46; *see also* Am. Compl. ¶ 53.) (emphasis added). Winterland responded immediately, placing Kampel on leave and barring him from entering

3

Winterland's premises or contacting any of its employees. (Compl. ¶ 47; *see also* Am. Compl. ¶ 54.) MML also filed suit against Kampel sometime in 1997 "for among other things, breach of fiduciary duty to recover for the damage he had caused to Winterland." (Compl. ¶ 52; *see also* Am. Compl. ¶ 62.) Yet, despite Kampel's confession, Lapides and Winterland continued to negotiate with Defendants, and of their own free will entered into the Shareholder Agreement on April 11, 1997, which even provided that MML would dismiss its lawsuit against Kampel. (Compl. ¶ 54; Am. Compl. ¶ 63.)

The Defendants placed Winterland in bankruptcy on August 8, 1997. (Compl. ¶ 54; Am. Compl. ¶ 65.) In 1998, "National City Bank ("NCB"), the Indenture Trustee of the 1993 Trust Indenture for the Senior Secured Notes, petitioned to place [Plaintiff] Transcolor [Corp. ("Transcolor")] in bankruptcy," (Compl. ¶ 60; Am. Compl. ¶ 67), and filed a lawsuit (the "NCB Lawsuit") against Lapides, Transcolor, and Plaintiff Alleco, Inc. ("Alleco") in 1999, "alleging malfeasance that harmed the Senior Note Holders." (Compl. ¶ 62; Am. Compl. ¶ 68.) Winterland was discharged from bankruptcy on July 5, 2000, at which time its leases to Transcolor were officially terminated. (Compl. ¶ 59; Am. Compl. ¶ 69.) Finally, "[i]n 2001, Kampel testified during a hearing in the NCB Lawsuit that Gordon Brothers Capital and Cerebrus had arranged a sale of Winterland." (Compl. ¶ 63; *see also* Am. Compl. ¶ 70.)

Based on the foregoing, Winterland, Transcolor, MML, Alleco, the Senior Note Holders (21 of the individual plaintiffs), and Lapides knew of their injuries by – at the latest - 2001. The remaining plaintiffs (the Cancer Foundation, Inc.; Valley Rivet Company, Inc.; and VR Holdings, Inc.) knew or should have known of their injuries by 2001 based on their affiliation with the latter parties. Therefore, as pled in the Complaints, Plaintiffs had actual notice of the

4

alleged conspiracy to "wrest" control of Winterland and any injuries relating thereto as early as March 4, 1997 and no later than 2001. (Compl. ¶ 47; Am. Compl. ¶ 54.)

## PROCEDURAL HISTORY

Plaintiffs filed the first frivolous complaint with this Court on July 23, 2007.[2] On September 18, 2007, counsel for the Cerberus Defendants served a motion for Rule 11 sanctions (the "First Rule 11 Motion") on Plaintiffs' attorneys, describing the defects in the Original Complaint and warning that the motion would be filed with the Court if the offending pleading was not withdrawn within the 21-day "safe harbor" period provided by Rule 11. Plaintiffs replied by letter on September 27 that they intended to file an amended complaint on or before October 10, when the safe harbor ended. Plaintiffs did not file an amended complaint by that date and the Cerberus Defendants filed the First Rule 11 Motion with the Court on October 11.

On October 23, 2007, nearly two weeks after the safe harbor period expired, Plaintiffs filed the Amended Complaint. The Amended Complaint restates the Original Complaint in large part, but adds the following: (1) a count for civil conspiracy (Am. Compl. ¶¶ 116-19); (2) allegations that Lapides and "Winterland management" were finally made aware of the alleged conspiracy from a July 3, 2006 *Forbes* magazine article indicating Third Avenue's interest in investing in small cap stocks (Am. Compl. ¶¶ 45, 84); (3) allegations that the Defendants breached "express written terms" of the Shareholder Agreement (Am. Compl. ¶ 90); and (4) allegations that the alleged racketeering activity was not completed until January 2007 when Winterland exited its second bankruptcy and Defendants "could first realize their ill-gotten gains" (Am. Compl. ¶¶ 97, 105). Like the Original Complaint, the Amended Complaint is patently frivolous and in no way cures the defects described in the First Rule 11 Motion.

---

[2] The Complaint was reported in various media outlets, and the ensuing publicity caused damage to the business and reputations of the Defendants.

5

Plaintiffs filed a motion to strike the First Rule 11 Motion on October 30, 2007 on the grounds that they had filed the Amended Complaint, regardless of compliance with Rule 11. This Court denied the motion to strike on November 1, 2007 and allowed the consolidation of the First Rule 11 Motion with the instant motion based on the Amended Complaint.

In accordance with Rule 11, the Defendants brought this matter to the attention of Plaintiffs' counsel by service of this consolidated Rule 11 motion (the "Consolidated Motion") and letter, attached hereto as Exhibit A, on November 9, 2007. Once again, more than 21 days have elapsed since service of the Consolidated Motion, necessitating the filing of this motion.

## ARGUMENT

### I. PLAINTIFFS' ATTORNEYS VIOLATED RULE 11.

Rule 11 provides, in pertinent part, that any paper submitted to the Court is to be signed, and that such signature certifies that:

> (b) *[T]o the best of the person's knowledge. information, and belief, formed after an inquiry reasonable under the circumstances,–*
>
> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; [and]
>
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification or reversal of existing law or the establishment of new law. ...

Fed. R. Civ. P. 11(b) (emphasis added).

Rule 11 serves "to deter baseless filings in district court and thus ... streamline the administration and procedure of the federal courts." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990). Rule 11 requires that an attorney signing a court document certify that he has "read the document, has conducted a reasonable inquiry into the facts and the law and is satisfied

6

that the document is well grounded in both, and is acting without any improper motive." *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 542 (1991).

To determine if Rule 11 sanctions are warranted, the court evaluates the parties' conduct for "reasonableness under the circumstances." *Denari v. Genesis Ins. Co.*, No. 01 C2015, 2004 WL 1375735, at *4 (N.D. Ill. June 17, 2004) (*citing Indianapolis Colts v. Mayor & City Council*, 775 F.2d 177, 181 (7th Cir. 1985)). Courts have imposed Rule 11 sanctions where "a reasonable and competent inquiry... would have revealed that the claims asserted therein were barred by the applicable statutes of limitation." *Hass v. The Rico Enter.*, No. 03 C 8695, 2004 WL 1385837, at *5 (N.D. Ill. June 18, 2004) (complaint "clearly barred by the applicable statutes of limitation" held to be frivolous); *see also Dreis & Krump Mfg. Co. v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No. 8*, 802 F.2d 247, 255 (7th Cir. 1986) ("No competent attorney who made a reasonable inquiry into the state of the law . . . could have thought the suit had any possible merit. He should have known it was time-barred . . . .").

### A. Both of The Complaints Are Sanctionable Under Rule 11

A party must grant an alleged Rule 11 violator 21 days to withdraw or otherwise "appropriately correct" the challenged paper before filing a Rule 11 motion. Fed.R.Civ.P. 11(c)(1)(A). As the Court recognized in its denial of Plaintiffs' motion to strike, "once [this] safe harbor period has expired," the time for corrective action has passed, "the violation is complete" and the Rule 11 motion demands a response. *See Jackson v. Rohm & Haas Co.*, No. Civ.A. 05-4988, 2006 WL 680933, at *4 (E.D. Pa. Mar. 9, 2006) (amended complaint filed past the 21-day safe harbor period not deemed a response to a filed Rule 11 motion).

Defendants now seek Rule 11 sanctions with respect to the Amended Complaint as well. First, the Amended Complaint does nothing to correct the defects of the Original Complaint, and is also sanctionable. *See, e.g., Ultra-Temp Corp. v. Adv. Vacuum Sys., Inc.*, 194 F.R.D. 378 (D.

7

Mass. 2000) (since sanctions were imposed for failure to conduct an adequate pre-filing investigation, the mere filing of an amended complaint did nothing to cure this, particularly where the amended complaint merely restated its original claims and added two additional claims); *Payman v. Mizra*, 82 Fed.Appx. 826 (4th Cir. 2003), *cert. denied* 124 S.Ct. 2052 (2004)(amended complaint did not substantively differ from the original complaint and constituted no attempt to cure the alleged lack of evidentiary support for the plaintiff's claims in the original complaint, which did warrant sanctions). Second, had Plaintiffs correctly withdrawn either complaint within the safe harbor period, Defendants would not have had to incur the additional expense of responding to the similarly frivolous Amended Complaint. *See Jackson*, 2006 WL 680933 at *4 (acknowledging that had the complaint been withdrawn during the 21-day period, no motion to dismiss or associated major cost to defendants would have accrued).

### B. Plaintiffs' Attorneys Failed to Reasonably Investigate the Patently Time-Barred Claims in Both Complaints.

If Plaintiffs' attorneys reasonably investigated the claims asserted in the Complaints, they should have immediately realized that none of the claims were viable under any conceivably applicable statute of limitations and that no doctrine of equitable tolling could possibly have applied. Their clients were, in actual fact, aware of most of their claims by March 4, 1997, their contract claim by August 8, 1997, and at least on inquiry notice of their claims still prior to those dates.[3] The fact that Plaintiffs' claims are so clearly time-barred indicates that the Complaints could have been filed for no other purpose than harassment.

### 1. Plaintiffs' RICO Claims Are Clearly Time-Barred.

Plaintiffs justify invocation of Federal question jurisdiction based on Counts III and IV of

---

[3] Plaintiffs were on inquiry notice by way of Kampel's outright disobedience and refusal to obtain alternative financing. (Compl. ¶¶ 44-45; Am. Compl. ¶¶ 49-52.)

8

the Complaints, which allege untimely civil RICO and RICO conspiracy claims. (Compl. ¶¶ 1, 82-93; Am. Compl. ¶¶ 1, 92-109.) The four-year statute of limitations for civil RICO actions accrues upon "discovery of the injury, not discovery of the other elements of a claim[.]" *Rotella v. Wood*, 528 U.S. 549, 555 (2000); *Agency Holding Corp. v. Malley-Duff & Assocs. Inc.*, 483 U.S. 143 (1987); *Bontkowski v. First Nat'l Bank of Cicero*, 998 F.2d 459, 461 (7th Cir. 1993) (internal quotation omitted) (finding that the statute of limitations begins to run once a "plaintiff discovers her injury, even if she has not yet discovered the pattern of racketeering."). The Supreme Court has explicitly rejected the accrual of civil RICO claims as of the "last predicate act." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997) ("[T]he plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period."). Moreover, while "the pattern element of RICO gives rise to the cause of action, [it] is not the injury itself." *Limestone Dev. Corp. v. Village of Lemont*, 473 F. Supp. 2d 858, 869 (N.D. Ill. 2007) (quoting *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1465 (7th Cir. 1992)).

As pleaded in the Complaints, Plaintiffs were aware of their injuries relating to the "wresting of control" of Winterland from MML as early as April 11, 1997, when GBCC and Cerberus obtained a majority ownership in Winterland. (Compl. ¶ 54; Am. Compl. ¶ 63.) Even earlier still, Plaintiffs gained actual knowledge of the alleged racketeering activity when Kampel admitted that he conspired with the Defendants to take control of Winterland on March 4, 1997. (Compl. ¶ 46; Am. Compl. ¶ 53). Evincing awareness of the existence of its injuries, MML filed suit against Kampel in 1997 hoping to recover for damages stemming from Kampel's role in the "conspiracy." (Compl. ¶ 52; Am. Compl. ¶ 62); *see Saladino v. Redisi*, No. 02 C 50307, 2004 WL 2075126, at *1 (N.D. Ill. Aug. 30, 2004) (finding that plaintiffs had knowledge of their

9

injuries as of the date of filing a prior lawsuit "based on the conduct now alleged to support the RICO claim"). Under the most liberal construction of the Complaints, Plaintiffs at the latest "discovered" that the Defendants "had arranged a sale of Winterland" in 2001 from Kampel's testimony in the NCB Lawsuit. (Compl. ¶ 63; Am. Compl. ¶ 70.) Thus, Plaintiffs' last opportunity to bring its RICO claims was at best sometime in 2005.

In the Amended Complaint, Plaintiffs attempt to avoid the statute of limitations by reference to Winterland's exit from its second bankruptcy in January 2007. (Am. Compl. ¶¶ 97, 105.) This is unavailing because the discharge from bankruptcy has no bearing on Plaintiffs' prior knowledge of their injuries and, even assuming the discharge could somehow be construed as a "last predicate act," the Supreme Court explicitly rejected the "last predicate act" rule of accrual. *Klehr*, 521 U.S. at 190; *Limestone Dev. Corp.*, 473 F. Supp. 2d at 871 (finding the outcome of an eminent domain proceeding irrelevant to the date plaintiffs discovered injuries relating thereto). Further, as more fully discussed below, Plaintiffs' actual knowledge of their injuries precludes equitable tolling or equitable estoppel based on allegations of fraudulent concealment. *See* Sec. I.B.2., *infra*. Therefore, the RICO claims are untimely.

### 2. Plaintiffs' Allegations of Fraudulent Concealment Fail to Toll Any Statutes of Limitation Because Plaintiffs Had Actual Knowledge of their Claims.

Plaintiffs' bald allegations of fraudulent concealment in Count I of the Complaints do not overcome the staleness of their claims. In Illinois,[4] where a defendant fraudulently conceals a cause of action, a plaintiff must bring an action at any time within five years after the plaintiff discovers such cause of action. 735 ILCS 5/13-215 (West 2007). Fraudulent concealment,

---

[4] Illinois law applies to ascertain the relevant statutes of limitations for Plaintiffs' supplemental state claims. *See Telular Corp. v. Mentor Graphics Corp.*, 282 F. Supp. 2d 869, 871 (N.D. Ill. 2003) (applying Illinois law for analysis of the statute of limitations "even where the litigants are parties to a contract containing a choice of law provision.").

10

however, is inapplicable "when the plaintiff retained the ability, notwithstanding the defendant's delay or resistance, to obtain information necessary to pursue his claim." *Int'l Star Registry of Ill. v. ABC Radio Network, Inc.*, 451 F. Supp. 2d 982, 987 (N.D. Ill. 2006) (quoting *Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696, 702 (7th Cir. 2001)). Furthermore, if a defendant does not actively conceal a fraud, which Plaintiffs have not alleged here, a plaintiff must diligently attempt to uncover the fraud. *See id.* (quoting *Leffler v. Engler, Zoghlin & Mann, Ltd.*, 157 Ill. App. 3d 718, 510 N.E. 2d 1018 (Ill. App. Ct., 1st Dist. 1987)) ("Illinois' discovery statute does not 'extend a limitation period when with ordinary diligence the plaintiff might have discovered, within the limitation period, that the cause of action existed.'"); *Graves v. Combined Ins. Co. of Am.*, No. 95 C 606, 1995 WL 611873, at *2 (N.D.Ill. Oct. 16, 1995).

The Complaints are devoid of any allegations of Defendants' active concealment and, as more fully discussed above, the allegations reveal that Plaintiffs discovered the existence of their purported claims as early as 1997. *See* Sec. I.B.1., *supra*. Accordingly, Defendants' supposed failure to disclose an alleged agreement with Kampel to take over the ownership of Winterland, (Compl. ¶¶ 72-75), or that Plaintiffs could not have known about the alleged conspiracy until Defendants' until Lapides read a July 3, 2006 *Forbes* magazine article about Third Avenue's plans to "tak[e] over 'small cap' companies" in 1997,[5] (Am. Compl. ¶¶ 45, 84), could not

---

[5] The fact that Third Avenue was allegedly "introduced to Winterland as an alternative lender — not an entity interested in the takeover of Winterland" (Am. Compl. ¶ 49) has no bearing on Plaintiffs' prior knowledge of the existence of their claims against either Gordon Bros. or the Cerberus Defendants. Incidentally, the Amended Complaint misrepresents the *Forbes* article, which does not state that "Defendant Whitman had determined in 1997 that Third Avenue should begin investing in and taking over 'small cap' companies." (Am. Compl. ¶ 84.) In fact, at most, the article states that a colleague of Defendant Whitman convinced him that Third Avenue needed to *start* a small-cap fund, not "take over" small-cap companies. See Michael Maiello, *The Evolution of Marty Whitman*, Forbes, July 3, 2006, at 85-88, attached hereto as Ex. B. ("[D]ocuments that a defendant attaches to a motion… are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *TCF Nat'l Bank v. CVS Corp.*, No. 06 C 3990, 2007 WL 329152, at *1 (N.D.Ill. Jan. 31, 2007) (citing *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir.1993)).)

11

support a claim for fraudulent concealment. The plain language of the Complaints leave no doubt that with even less than "ordinary diligence" the Plaintiffs should have discovered (and in fact did discover) their causes of action within the respective limitations periods. Therefore, Plaintiffs cannot reasonably rely upon the allegation of fraudulent concealment to resuscitate any indisputably untimely claims.

### 3. Plaintiffs' Supplemental State Law Claims Are Untimely.

*(a) Plaintiffs' Breach of Contract Claims Are Time-Barred.*

The statute of limitations for breach of an implied covenant of a contract is five years from the time of the breach, whereas breach of an express written term of a contract is ten years from the time of the breach. 735 ILCS §§ 5/13-205, 5/13-206 (West 2007). In order to determine which statute of limitations applies, courts look at whether "the existence of [a written] contract or one of its essential terms must be proven by parol evidence ... [I]f parol evidence is necessary to make the contract complete, then the contract must be treated as oral for the purpose of the statute of limitations." *Armstrong v. Guigler*, 673 N.E.2d 290, 294 (Ill. 1996); *Cameron Gen. Corp. v. Hafnia Holdings, Inc.*, 289 Ill. App. 3d 495, 505, 683 N.E. 2d 1231, 1237 (Ill. App. Ct., 1st Dist. 1997) (*citing Toth v. Mansell*, 207 Ill. App. 3d 665, 669, 566 N.E. 2d 730, 733 (Ill. App. Ct., 1st Dist. 1990) (holding that in Illinois, "[a] contract is considered written for purposes of the statute of limitations if all essential terms are reduced to writing and can be ascertained from the instrument itself."). Moreover, "it is only where liability emanates from a breach of a contractual obligation that the action may be fairly characterized as 'an action on a written contract.'" *Armstrong*, 673 N.E.2d at 295-96 (applying the five-year statute of

limitations to a claim for breach of an implied fiduciary duty even though the implied duty "ar[ose] by legal implication from the parties' relationship under a written agreement[.]").

The statute of limitations for Plaintiffs' breach of contract claim began running on August 8, 1997. (Compl. ¶ 57; Am. Compl. ¶ 65.) Therefore, the time for Plaintiffs to bring a claim for breach of a "material implied covenant," (Compl. ¶ 78; Am. Compl. ¶ 63), expired on August 8, 2002. In an apparent attempt to circumvent the five-year statute of limitations, Plaintiffs, in the Amended Complaint, point to Section 8.2 of the Shareholder Agreement, and allege breach of a material express term. (Am. Compl. ¶¶ 88, 90). But Section 8.2 in no way constitutes an agreement to immunize Winterland from bankruptcy in the event of a default.

That section, entitled "Further Assurances," merely states that the parties should "do and perform or cause to be done and performed all such further acts ... as any other party hereto *reasonably may request* in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby." (emphasis added); *see* Shareholder Agreement, attached hereto as Ex. C The Amended Complaint neither alleges that Plaintiffs requested that the Defendants refrain from placing Winterland into bankruptcy in order to "carry out the intent and accomplish the purposes of" the Shareholder Agreement, nor that such a request would have been reasonable under the terms of the contract and in the context of the transaction.

Plaintiffs cannot otherwise support their breach of contract claim without parol evidence or supplemental written documents. Thus, the agreement at issue is presumptively an unwritten contract for statute of limitations purposes. *Toth,* 207 Ill. App. 3d at 670-71, 566 N.E. 2d at 734. Accordingly, Plaintiffs' breach of contract claims are patently time-barred.

    *(b)*    *Plaintiffs' Tortious Interference and Civil Conspiracy Claims are Time-Barred*

13

Claims alleging tortious interference with an economic relationship and civil conspiracy are each governed by a five-year statute of limitations period which accrues at the time a plaintiff discovers the alleged wrongdoing.[6] See 735 ILCS § 5/13-205 (West 2007). Accordingly, the statute of limitations for plaintiffs' tortious interference and civil conspiracy claims began to run on March 4, 1997 when Kampel confessed to the alleged conspiracy - the underlying basis of both claims. (See, e.g., Compl. ¶¶ 46, 97; also see, e.g., Am. Compl. ¶¶ 53, 113.) Since Plaintiffs filed their Original Complaint more than five years after discovery of the alleged wrongdoing, their tortious interference and civil conspiracy claims are time-barred.

## II. RULE 11 PROVIDES THAT SANCTIONS MUST BE IMPOSED ON PLAINTIFFS AND THEIR COUNSEL.

Federal Rule of Civil Procedure 11(c) provides for the imposition of sanctions upon attorneys and parties who violate subdivision (b).[7] The Seventh Circuit has made it clear that where a lawsuit is "not well grounded in fact and is not warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law," the court has the authority to impose sanctions. *Nat'l Wrecking Co. v. Int'l Bhd. of Teamsters, Local 731*, 990 F.2d 957, 963 (7th Cir. 1993). A complaint in which all of its claims are time-barred is frivolous under Rule 11 in that it shows a failure to make a reasonable inquiry into the relevant facts and law. *See, e.g., Shelton v. Ernst & Young, LLP*, 143 F. Supp. 2d 982, 993-994 (N.D. Ill. 2001)

---

[6] S*ee also Hi-Lite Prod. Co. v. Am. Home Prod. Corp.*, 11 F.3d 1402, 1410 (7th Cir. 1993) (dismissing claims for tortious interference where they occurred or were discovered prior to five years from filing suit); *Poulos v. Lutheran Soc. Servs. of Ill., Inc.*, 312 Ill. App. 3d 731, 728 N.E. 2d 547 (Ill. App. Ct., 1st Dist. 2000) (holding that actions for tortious interference with contract are governed by Illinois' five-year statute of limitations). *See also Johnson v. State*, No. 96-4102, 1997 WL 413517, *1 (7th Cir. July 15, 1997) (internal quotation omitted) ("[A] civil conspiracy... accrues 'when the plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action.'"); *Gas Tech. Inst. v. Rehmat*, No. 05 C 2712, 2006 WL 3743576, at *34 (N.D.Ill. Dec. 15, 2006) (finding five-year statute of limitations applied to state law claims, including civil conspiracy to commit fraud)).

[7] Rule 11(c) provides, in pertinent part: "If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may...impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b), or are responsible for the violation."

(imposing sanctions on plaintiff's counsel for persisting to file time-barred claims despite being warned by defendant's counsel); *Fred A. Smith Lumber Co. v. Edidin*, 845 F.2d 750, 752 (7th Cir. 1988) (complaint was frivolous and sanctions imposed where it was filed nearly six years after the last alleged misrepresentation where a four-year statute of limitations applied).

Given the obvious staleness of the claims in the Complaints, Plaintiffs and Plaintiffs' counsel have clearly violated Rule 11. That the alleged harms took place as long ago as 1996 and 1997 should have in itself raised an immediate concern that any colorable claim would not likely have survived any applicable statute of limitations. Plaintiffs' counsel clearly failed to conduct a reasonable inquiry into the law or the results of such examination were simply ignored. Plaintiffs and Plaintiffs' counsel should be sanctioned for filing complaints with the Court that were so clearly time-barred, they could have no other reason than to harass the Defendants.

## CONCLUSION

For the foregoing reasons the Defendants' motion for sanctions against Plaintiffs and their attorneys should be granted in its entirety.

Dated: December 3, 2007

Respectfully submitted,

/s/ Zachary T. Fardon
Zachary T. Fardon
I.D. # 6292156

Allison V. Passman
I.D. # 6287610

LATHAM & WATKINS LLP
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago IL 60606
(312) 876-7700

*Attorneys for Defendants Gordon Brothers Group and Warren Feder*

/s/ Timothy J. Patenode
Timothy J. Patenode
I.D. # 6181232
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, Illinois 60661-3693
(312) 902-5200

Howard O. Godnick
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10022
(212) 756-2000

*Attorneys for Defendants Cerberus Capital Management, LP, Madeleine, LLC, and Stephen A. Feinberg*