IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CANCER FOUNDATION, INC ET AL. | ) | |
| | ) | |
| Plaintiffs, | ) | Judge Lefkow |
| | ) | |
| v. | ) | 07 C 4120 |
| | ) | |
| CERBERUS CAPITAL, | ) | |
| MANAGEMENT, LP, ET AL., | ) | Magistrate Judge Keys |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' ANSWER TO
DEFENDANTS' MOTIONS FOR RULE 11 SANCTIONS
AND FOR RULE 12 DISMISSAL**

Dated: January 29, 2008

## TABLE OF AUTHORITIES

### Cases

*Barr v. Wash. Mut. Bank*, 2004 U.S. Dist. LEXIS 14909 at * 4-5
(N.D. Ill. July 30, 2004)…....................................................................................21

*Brown v. Fed'n of State Medical Bds.*, 830 F.2d 1429, 1438 (7th Cir. 1987)…..........12

*C-B Realty and Trading Corp. v. Harris Trust & Savings Bank*, 289 Ill.App.3d 892, 897
(1st Dist. 1997)(quoting *Hi-Lite Products Co. v. Am. Home Products Corp.*, 11 F.3d
1402, 1409 (7th Cir. 1993))…….........................................................................17

*Covington v. Mitsubishi Motor Manufacturers of America, Inc.*, 154 Fed.Appx. 523, 2005
U.S. App. LEXIS 24822 (7th Cir. Nov. 15, 2005)…….........................................21

*D'Angelo v. J&F Steel Corporation*, 2003 U.S. Dist. LEXIS 16736 at *3 (N.D. Ill. Sept.
23 2003)(quoting *Walter v. Fiorenzo*, 840 F.2d 427, 436 (7th Cir. 1988))…........18,19

*Friedman v. HHL Financial Services, Inc.* 1994 U.S. Dist. LEXIS 557 at *4 (N.D. Ill.
Jan. 24, 1994)….....................................................................................................11

*Gomez v. Toledo*, 446 U.S. 635 (1980)……..............................................…......21

*Hass v. Rico Enterprise*, 2004 U.S. Dist. LEXIS 11189
(N.D. Ill. June 18, 2004)………..............................................…..................20

*In re Kunstler*, 914 F.2d 505, 522 (4th Cir. 1990)…..........................................12, 20

*In re TCI*, 769 F.2d 441, 445 (7th Cir. 1985)……..........................................…...19

*Kale v. Combined Insur. Co. of Amer.*, 861 F.2d 746, 758 (1st Cir. 1988)…...........…18

*Lee v. Allstate Life Ins. Co.*, 2005 Ill.App. LEXIS 995 at *17
(2d Dist. Sept. 29, 2005)……..............................................…......................17

*Marco Holding Co. v. Lear Siegler, Inc.*, 606 F.Supp. 204, 211 (N.D. Ill. 1985)……...12

*Maduakolam v. Columbia University*, 866 F.2d 53, 56 (2nd Cir. 1989)….................19

*Matzke v. Merck & Co.*, 848 F. Supp 936 (D.C. Kan. 1994)…...............................19

*O'Connell v. Champion Int'l Corp.*, 812 F.2d 393, 395 (8th Cir 1987)…..................18

*Skinner v. Shirley of Hollywood*, 723 F.Supp. 50, 54 (N.D. Ill. 1989)......................17

*Toth v. Mansell*, 207 Ill.App.3d 665 (1st Dist. 1990)...........................……....…........16,17

*United States Gypsum Co. v. Indiana Gas Co.,* 189 F.3d 492, 494 (7th Cir. 1999).......22

*United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005)...................................…..........22

*United States v. Northern Trust Co.,* 373 F.3d 886, 888 (7th Cir. 2004)………........22,23

*Walker v. Thompson*, 288 F.3d 1005, 1010 (7th Cir. 2002)................................…..22

*Wartsila NSD N. Am., Inc. v. Hill Int'l, Inc.,* 315 F Supp 2d 623, 627
(citing *Teamsters Local Union No. 430 v. Cement Express Inc.,* 841 F.2d 66, 68
(3rd Cir. 1988))............................................................................................12,13,14

*Xechem, Inc. v. Bristol-Myers Squib Co.,* 372 F.3d 899, 901 (7th Cir. 2004)……..........21

## Statutes

735 ILCS 13/206…………………………………………………………………..18

## Rules

Fed.R.Civ.P. 11(b)(1)........................................................................................11

Fed.R.Civ.P. 11, Notes of Advisory Committee on 1993 Amendments
(2007)…………...……………………………………………………...11,12,13,14,20

Fed.R.Civ.P. 11(c)(5)(A)…………………………………………………………...18

Fed.R.Civ.P. Rule 11(c)(5)(A)…………………………………………………..21

Fed.R.Civ.P. 12(b)…………………………………………………………….......21

Rule 12(b)(6)………………………………………………………………….…...21

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THE CANCER FOUNDATION, INC.,    )
et alia,    )
    )
        Plaintiffs,    )    07 C 4120
    )
    v.    )    JURY DEMANDED
    )
CERBERUS CAPITAL,    )    Judge Lefkow
MANAGEMENT, LP, et alia,    )
    )    Magistrate Judge Keys
        Defendants.    )

PLAINTIFFS' ANSWER TO
DEFENDANTS' MOTIONS FOR RULE 11 SANCTIONS
AND FOR RULE 12 DISMISSAL

Plaintiffs The Cancer Foundation Inc. ("CFI"), Alleco, Inc., Transcolor Corp.

("Transcolor"), MML, Inc. ("MML"), Valley Rivet, VR Holdings, Inc. ("VRH"), and 22

individual shareholder investors, by their attorneys, answer the joint consolidated motion

for Rule 11 sanctions of defendants Cerberus Capital Management, LP ("Cerberus"),

Madeleine, LLC, Gordon Brothers Group ("GBCC"), Third Avenue Value Fund ("Third

Avenue"), Stephen A. Feinberg, Martin J. Whitman, and Warren Feder (collectively

"defendants"). Defendants also moved orally for dismissal pursuant to Rule 12(b) on

their statute of limitations defense.

The amended complaint is a proper and viable pleading on all counts, is well

grounded in law and fact, and precludes the entry of sanctions against plaintiffs.[1]

---

[1] This answer only specifically addresses the allegations in the Amended Complaint. For the reasons set forth in this answer, the original Complaint is not sanctionable pursuant to Rule 11. Further, because parties are permitted to amend complaints once as a matter of course (Fed.R.Civ.P. 15), the original complaint is not sanctionable. Finally, the Amended Complaint cured any potential defects in the original complaint.

Defendants are not entitled to Rule 11 sanctions. Defendants' Rule 11 motion lacks merit and should be denied.

For the very same reasons, the Court should also deny the Rule 12(b) motion to dismiss.

## INTRODUCTION

This is an action for fraudulent concealment, breach of contract, civil RICO, conspiracy to engage in a pattern of racketeering enterprise, tortuous interference with an economic relationship, and civil conspiracy.

Plaintiff CFI is a not-for-profit corporation whose mission is to support alternative and conventional therapies used concurrently to cure cancer. Amended Complaint ("Am.Compl.") at ¶4. CFI was the intended beneficiary of an $80,000,000 donation in 1998 from VRH. This donation was disrupted by defendants' fraudulent and tortuous conduct.

Plaintiffs Alleco, Transcolor, MML, Valley Rivet, VRH are companies that were financially destroyed by defendants.

The individual plaintiffs are shareholders and senior secured note holders of Alleco of which plaintiff Transcolor became jointly and severally liable. Am.Compl. at ¶3. Plaintiff Morton M. Lapides, Sr. ("Lapides") held an ownership interest in Winterland, Transcolor, Alleco, MML, Valley Rivet, and VRH. Am.Compl. at ¶ 9.

The amended complaint alleges, among other things, that, as part of an unlawful conspiracy between them and others, defendant lenders Cerberus and GBCC acted to deprive the owners of Winterland of their equity interest through unlawful and predatory credit practices and to damage companies and individuals associated with Winterland.

2

For instance, Cerberus and GBCC made a six month bridge loan to Winterland, took 20% of Winterland stock during the term of the loan, actively and successfully prevented the repayment of this loan, and, after the signing of the Shareholder Agreement in April 1997, took 80% of Winterland's shares, placed Winterland in bankruptcy twice, and froze out the now-minority shareholders. This conspiracy caused a domino effect that over a period of time damaged the corporate and individual plaintiffs--in total, about 2,500 individuals and entities. Defendants' misconduct caused damage in excess of $1,500,000,000, including interest and lost earnings through 2006.

This case is not as simple as defendants would have the Court believe. Defendants ask the Court to focus on a specific set of concerns about one individual in 1997 (Carl Kampel) who is not even a party to this case and to ignore all other evidence. There is significant evidence about events, conversations, and verbal agreements between the parties over an extended period of time. This evidence undercuts defendants' contentions that plaintiffs knew about their claims against defendants in 1997.

Plaintiffs allege sufficient facts to toll the relevant statutes during the limitations period for each count. Taking into account all of the evidence, it is unquestionable that issues of fact concerning the tolling of the statutes of limitations are disputed and must proceed through the judicial process. Plaintiffs' claims are not frivolous, are not untimely, and are certainly not sanctionable. The statute of limitations defense should be denied.

## FACTUAL BACKGROUND

In March 1996, MML, Transcolor's parent company, began negotiations to purchase Winterland through a six month term bridge loan. Am.Compl. at ¶25-26. MML intended to consolidate Transcolor with Winterland. Am.Compl. at ¶26.

Valley Rivet was a subsidiary of Transcolor and loaned it $3,000,000. Am.Compl. at ¶27. With MML's purchase of Winterland and Winterland's purchase of all screen printing assets of Transcolor, Transcolor's remaining assets were Valley Rivet and leases with Winterland that were to generate approximately $14,000,000 over a 10 year period. Am.Compl. at ¶28. As a result, Transcolor morphed from a company that owed $3,000,000 to a highly lucrative enterprise, with a cash flow of over $100,000,000 over a decade. Am.Compl. at ¶29.

Through its affiliate Madeleine, defendants GBCC and Cerberus extended Winterland a $23,000,000 short-term line of credit due in February 1997, with exit fees of $4,500,000. Am.Compl. at ¶32. At the time that it was purchased for $21,000,000, with an additional $2,000,000 provided for working capital, Winterland was worth approximately $69,000,000. Id. Once they learned Winterland's true value, the lenders sought to take over the company. Mr. Lapides and MML further secured the line of credit by signing personal guarantees. Id.

Unknown to plaintiffs at that time, Carl Kampel, Winterland's Chief Financial Officer, met with GBCC's President, Mr. Feder, at least twice in 1996 and learned about Mr. Feder's intention to take over Winterland. Am.Compl. at ¶34-35. Mr. Feder worked for GBCC and Cerberus. Am.Compl. at ¶34. He later went to work for Carl Marks Advisory Group LLC.

4

While in December 1996 and January 1997, Winterland was in many ways a financial success. It repaid $10,000,000 of the line of credit. It had the remainder of the line of credit coming due in February 1997. Am.Compl. at ¶36.

Between November 1996 and January 1997, Mr. Kampel schemed to assist Cerberus and GBCC to take over Winterland and to personally acquire an equity position in it. Am.Compl. at ¶37. Third Avenue, Mr. Whitman, Mr. Feder, and Mr. Feinberg all participated in this scheme. Id. While some plaintiffs uncovered certain unlawful acts by Mr. Kampel in 1997, no plaintiff knew or understood defendants' involvement in the scheme at the time. They were only aware of Mr. Kampel's self-serving conduct. They were not aware of the active involvement of defendants in taking over Winterland.

By February 1997, Winterland needed long-term financing to stay afloat. Am.Compl. at ¶38. As part of the conspiracy, Winterland's chief financial officer, Mr. Kampel, purposely prevented Winterland from obtaining the necessary financing in order to force Winterland to sell itself to GBCC and Cerberus. Am.Compl. at ¶39, 43-44.

In February 1997, Mr. Feder told a lender, Capital Factors, that Mr. Kampel was on GBCC's "team" and that GBCC and Cerberus intended to take over Winterland from its current shareholder. Am.Compl. at ¶47. The Capital Factors' Vice President called Winterland's chairman, Morton M. Lapides, and told him that Mr. Kampel was seeking to force the loan into default and was promised equity if and when the lenders foreclosed. Mr. Lapides and Winterland's in-house counsel, John Woods, confronted Mr. Kampel the next day. Am.Compl. at ¶53.

Plaintiffs did not understand and could not have fairly understood that Mr. Kampel was working with GBCC or Cerberus. The amended complaint states that Mr.

Kampel was working to favor the interests of GBCC and Cerberus and against the interests of Winterland, all for Mr. Kampel's personal interest. It is obvious that plaintiffs did not know about defendants' involvement in the scheme because Winterland management ordered Mr. Kampel to negotiate long-term financing with defendants GBCC and Cerberus. Am.Compl. at ¶49.

Winterland management would not agree to long-term financing with GBCC and Cerberus (which would result in MML losing control of Winterland), unless it was given sufficient notice to secure long-term financing from another source. Am.Compl. at ¶49. Mr. Kampel violated management's orders by entering into an agreement with GBCC and Cerberus on March 15, 1997 and foreclosed alternative long-term financing. Am.Compl. at ¶50. Plaintiffs did not know that GBCC and Cerberus schemed with Mr. Kampel to enter this agreement and do not allege that they knew GBCC's and Cerberus' involvement at the time.

Winterland management and suppliers were extremely concerned that the six month bridge loan would not be repaid by February, 1997. Winterland was highly profitable. However, it was questionable whether Winterland would be able to refinance the short-term financing with GBCC and Cerberus and ultimately retain 80% interest of its shareholder investment.

Mr. Kampel also took other actions to weaken Winterland's financial picture. Am.Compl. at ¶¶55-61. GBCC and Cerberus pretended to act independently of Mr. Kampel by "notifying" Winterland that it was in default of its credit line for failing to submit monthly financial statements. Am.Compl. at ¶59. In-house counsel, John Woods, asked Mr. Kampel whether he was preparing and sending monthly financial statements.

Am.Compl. at ¶61. Mr. Kampel stated that he was not. Id. He also did not forward material to potential long-term lenders and did not speak to interested parties. Am.Compl. at ¶61.

The complaints in this case do not allege that Mr. Kampel admitted that he "conspired" with defendants to take control of Winterland as defendants contend. See, e.g., Defendants' Rule 11 Motion at p. 9. Mr. Kampel did not make any such admission. He did say that, if GBCC took over Winterland, it would give him Winterland stock on favorable terms. Am.Compl. at 53.

Defendants continue to contort the record (on page 9 of their sanctions motion) where they cite to ¶62 in plaintiffs' amended complaint and claim that "MML filed suit against Kampel in 1997 hoping to recover for damages stemming from Kampel's role in the 'conspiracy'". Paragraph 62 of plaintiffs' amended complaint simply states:

Winterland subsequently filed suit against Kampel alleging breach of fiduciary duty and related counts seeking recovery of the damage Kampel had caused to Winterland. Am.Compl. at ¶62. There was no allegation about suing anyone for conspiracy at that time.

More fundamentally, at the time of the Kampel lawsuit, Winterland was not controlled by any plaintiff. It was, in fact, controlled by GBCC and Cerberus. In other words, GBCC and Cerberus sued Mr. Kampel and alleged breach of fiduciary duty. Given that the actual, concealed breach of fiduciary duty specifically involved and implicated GBCC and Cerberus themselves and given that the complaint makes no mention of the involvement of GBCC and Cerberus, the Kampel lawsuit is just another step in defendant's cover up and concealment of its conspiracy.

Due to this cover up, Winterland and MML had no reason to believe that these companies were collaborating with Mr. Kampel. Plaintiffs only understood certain aspects of Mr. Kampel's misconduct at that time. As a result, plaintiffs were willing to continue to conduct business with defendants so long as Mr. Kampel was terminated.

On April 11, 1997, MML entered into a Shareholder and Settlement Agreement with GBCC and Cerberus (through Madeleine) with very favorable terms for GBCC and Cerberus. Am.Compl. at ¶63. GBCC and Cerberus became 80% owners of Winterland, with MML only keeping 20%. This shareholder situation was reversable within a twelve month period. Am.Compl. at ¶63(1). The Settlement Agreement eliminated the $4,500,000 exit fee of the original loan. GBCC and Cerberus agreed not to rehire Kampel. Am.Compl. at ¶63(2)-(3). GBCC and Cerberus also agreed not to interfere with Winterland's operations for a year. Am.Compl. at ¶63(8)

In 1997, if they knew that all defendants were working together and that their goal was the takeover of Winterland and the elimination of the shareholding rights of Winterland's individual and corporate owners, plaintiffs would not have entered into any agreement with defendants at the time, especially one which gave Cerberus and GBCC 80% of Winterland. Defendants' contention that plaintiffs knew about the conspiracy simply does not make any sense in light of these undisputed facts.

After the Settlement Agreement was executed, Winterland's financial picture continued to improve. In the three month time period between the time that it signed the Agreement in April 1997 and August 1997 (when the lenders placed Winterland in bankruptcy), Winterland earned an additional $1,000,000 and had repaid a total of $11,000,000 against the $23,000,000 GBCC/Cerberus obligation. It was stabilized

financially and on a track to succeed. Winterland was not a candidate for bankruptcy. Not even close.

Nevertheless, in August 1997, GBCC and Cerberus placed Winterland into bankruptcy, starting the demise of plaintiffs' companies, denying creditors what was owed, and eliminating the individuals' and corporations' investments. Am.Compl. at ¶¶65-67, 71-78. The Cancer Foundation was also denied the promised $80,000,000 donation. Am.Compl. at ¶78.

The bankruptcy of Winterland eliminated the Transcolor agreements and the Shareholders Settlement Agreement with MML, Inc. As a result of the bankruptcy, Winterland stopped paying Transcolor and Transcolor failed to pay the interest of the senior secured notes.

Shortly after the Winterland bankruptcy, Transcolor was forced into bankruptcy by National City Bank ("NCB"), the Indenture Trustee of the 1993 Trust Indenture and 1995 Supplemental Indenture for the Senior Secured Notes. Am.Compl. at ¶67. NCB then sued Mr. Lapidia, Transcolor, and Alleco. In 2001, Mr. Kampel testified that he arranged the sale of Winterland to GBCC and Cerberus. The amended complaint specifically states that plaintiffs did not know that the Wintersale sale was arranged prior to this time. Am.Compl. at ¶70.

Plaintiffs did not understand the significance of this statement at the time and certainly did not interpret it to mean that defendants were conspiring with Mr. Kampel to take over Winterland. Mr. Kampel could have been referring to the 1997 Shareholder and Settlement Agreement that allowed GBCC and Cerberus to become majority owners and had Winterland sue him in July 1997 and subsequently arranged to dismiss the

lawsuit against Kampel.

After Winterland was discharged in bankruptcy, it became financially stable due to long term financing. However, GBCC and Cerberus destroyed the Winterland business plan and again placed Winterland into bankruptcy. Am.Compl. at ¶71. In January 2007, the Bankruptcy Court authorized GBCC and Cerberus to sell Winterland's assets. Am.Compl. at ¶72.

Plaintiffs finally understood defendants' plan to wrest control of Winterland after Mr. Lapides read a July 3, 2006 article in Forbes magazine. Am.Compl. at ¶45. This article allowed Mr. Lapides to start a personal investigation into defendants' conduct. Id.

Specifically, the article stated that, in 1997, Whitman determined that Third Avenue should begin investing in and taking over "small cap" companies. Am.Compl. at ¶45. Winterland is a small cap company. From this information, Mr. Lapides and the other plaintiffs pieced together defendants' involvement in the conspiracy.

For example, in April 1997, when Mr. Lapides signed the Shareholder and Settlement Agreement, defendant GBCC and Cerberus insisted that defendant Third Avenue and Carl Marks be granted immunity in the Shareholder Agreement. After plaintiffs learned that Third Avenue was targeting small cap companies such as Winterland back in 1997, they now understand that this immunity provision was an intentional step in the conspiracy for the lenders to take over Winterland with Third Avenue and Carl Marks.

This fact motivated plaintiffs to seek more information. It took until 2006 to piece everything together.

On December 12, 2007, during the safe harbor time period of Rule 11, plaintiffs'

former attorneys moved to withdraw their appearances. The Court should not consider these withdrawals as a concession of any infirmity in the Amended Complaint.

Plaintiffs assert their attorney/client privileges concerning all confidential communications between and among them and the former attorneys. Given this assertion, plaintiffs advise the Court that these withdrawals were not the result of an evaluation by the former attorneys that the Amended Complaint is barred by the statute of limitations or violates Rule 11. In fact, plaintiffs instructed the former attorneys to file the Court, simultaneous with this answer, a statement that it was and is their professional opinion that the Amended Complaint is viable.

At the Court's request, plaintiffs will make a confidential in camera submission on this issue.

## ARGUMENT

I.    Standards of Proof for Rule 11 Sanctions.

Rule 11 of the Federal Rules of Civil Procedure provides that, "if an attorney files pleadings that are not reasonably based on the law or in fact, or that are meant to harass," the Court may impose an appropriate sanction. Fed.R.Civ.P. 11. Litigants violate Rule 11 when they file suit for an improper purpose, such as to harass a party or needlessly increase the cost of litigation. Fed.R.Civ.P. 11(b)(1); Friedman v. HHL Financial Services, Inc., 1994 U.S. Dist. LEXIS 557 at *4 (N.D. Ill. Jan. 24, 1994).

Rule 11 provides two grounds for sanctions: namely, the "frivolousness" clause and the "improper purpose" clause. Friedman, 1994 U.S. Dist. LEXIS 557 at *5. The frivolousness clause requires that the party or the attorney conduct a reasonable inquiry into the facts and the law relevant to the case. Id. at *5-6. The improper purpose clause

ensures "that a motion, pleading, or other document may not be interposed for purposes of delay, harassment, or increasing the costs of litigation." Id. at *6. The standard for imposing sanctions under either prong of Rule 11 is an objective determination of whether the sanctioned party's conduct was reasonable under the circumstances. Id.

The Court has significant discretion in determining what sanctions, if any, should be imposed for a violation, subject to the principle that the sanctions should not be more severe than reasonably necessary to deter repetition of the conduct by the offending person or comparable conduct by similarly situated persons. Fed.R.Civ.P. 11, Notes of Advisory Committee on 1993 Amendments (2007); In re Kunstler, 914 F.2d 505, 522 (4th Cir. 1990)("the least severe sanction adequate to serve the purposes of Rule 11 should be imposed"). "The imposition of Rule 11 sanctions is properly reserved for exceptional circumstances." Wartsila NSD N. Am., Inc. v. Hill Int'l, Inc., 315 F Supp 2d 623, 627 (citing Teamsters Local Union No. 430 v. Cement Express Inc., 841 F.2d 66, 68 (3rd Cir. 1988)).

Rule 11 sanctions should not be imposed "to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories and a court should avoid using the wisdom of hindsight in examining the attorney's conduct at the time of pleading." Marco Holding Co. v. Lear Siegler, Inc., 606 F.Supp. 204, 211 (N.D. Ill. 1985). This principle applies with even more force when assessing sanctions against a represented party.

The most important purpose of Rule 11 sanctions is to deter frivolous litigation and the abusive practices of attorneys. Brown v. Fed'n of State Medical Bds., 830 F.2d 1429, 1438 (7th Cir. 1987). Rule 11 motions should not be made or threatened for minor, inconsequential violations of the standards prescribed by subdivision (b). Fed. R. Civ. P.

11, Notes of Advisory Committee on 1993 Amendments (2007). They should not be employed as a discovery device or to test the legal sufficiency or efficacy of allegations in the pleadings; other motions are available for those purposes. Id.

Rule 11 motions are not appropriate to emphasize the merits of a party's position, to exact an unjust settlement, to intimidate an adversary into withdrawing contentions that are fairly debatable, to increase the costs of litigation, to create a conflict of interest between attorney and client, or to seek disclosure of matters otherwise protected by the attorney-client privilege or the work-product doctrine. Id. The court may defer its ruling (or its decision as to the identity of the persons to be sanctioned) until final resolution of the case in order to avoid immediate conflicts of interest and to reduce the disruption created if a disclosure of attorney-client communications is needed to determine whether a violation occurred or to identify the person responsible for the violation. Id.; Wartsila, 315 F.Supp.2d 623.

Sanctions that involve monetary awards (such as a fine or an award of attorney's fees) may not be imposed on a represented party for violations of subdivision (b)(2), involving frivolous contentions of law. Fed.R.Civ.P. 11(c)(5)(A). Monetary responsibility for such violations is properly placed solely on the party's attorneys. Fed.R.Civ.P. 11, Notes of Advisory Committee on 1993 Amendments (2007).

II.     The Statute of Limitations for Each Count in the Amended Complaint Was Tolled
        At Least Until July 2006.

Defendants argue that there were two pivotal points where plaintiffs knew that defendants engaged in a pattern of misconduct--in 1997 when Mr. Kampel was exposed and in 2001 when Mr. Kampel testified at a hearing.

First, defendants essentially urge the Court to conduct an intensive inquiry into

13

the facts of this case. This inquiry is inappropriate at this stage in the litigation. While Rule 11 allows a party to seek sanctions for violations of the standards set out in Rule 11(b), "such a motion should not be sought reflexively or as a matter of course." Wartsila, 315 F.Supp.2d at 627.

"Rule 11 should not be used to raise issues of legal sufficiency that more properly can be disposed of by a motion for summary judgment." Wartsila, 315 F.Supp.2d at 628 (quoting 5A Wright & Miller, Federal Practice and Procedure 1336 (2003 Supp.)).

Second, defendants' two pivotal events did not start the running of the statutes because they did not disclose or uncover defendants' involvement in the conspiracy to wrest control of Winterland or other unlawful conduct.

It is clear that plaintiffs did not understand defendants' involvement in the conspiracy in 1997 because they continued to do business with them and even secured their indebtedness with Cerberus and GBCC with 80% of Winterland. How likely is it that a victim would actively assist in frauds against it when it knew or should have known that the frauds were underway and were performed by the very party that the victim trusted? Plaintiffs' actions are entirely inconsistent with a party who has reason to suspect another's conduct.

Further, plaintiffs still did not understand the defendants' misfeasance in 2001. Mr. Kampel's statement that a sale of Winterland was "arranged" does not infer conspiracy, concealment, and fraud, as plaintiffs allege today. Indeed, if the Kampel statement was so easily and readily interpreted in the way that defendants now urge, the Winterland Bankruptcy Trustee and the Transcolor Bankruptcy Trustee undoubtedly would have investigated it or turned it over to the United States Attorney for civil and/or

14

criminal inquiry.

It was not until the publication of the July 3, 2006 article that plaintiffs pieced together what really happened. The April 1997 immunity given to Cerberus, GCBB, Carl Marks and Third Avenue appeared innocuous and irrelevant at the time.[2] The July 2006 article illuminated that Third Avenue was buying small companies. When Cerberus, GCBB, Carl Marks and Third Avenue were given immunity, plaintiffs did not suspect that Third Avenue was targeting companies like Winterland to takeover. The Forbes article showed that small cap companies were in fact a target. This is crucial.

The amended complaint's additional allegations concerning the July 2006 article are essential facts to plaintiffs' argument for tolling of the statute of limitations. The amended complaint is substantively different from the original complaint and cured any potential defects.

Therefore, the statute of limitations on all counts did not start running until July 3, 2006. Plaintiffs filed their complaint within the appropriate time period.

Moreover, plaintiffs allege active concealment. They contend that defendants entered into the Shareholder Agreement with ill intentions and in bad faith. This is, in essence, active concealment.

Finally, plaintiffs were not placed on inquiry notice by way of Mr. Kampel's misconduct in 1997 as alleged by defendants in footnote 3 of their motion for sanctions. Plaintiffs were only aware of Mr. Kampel's misconduct at the time and worked diligently with defendants to resolve the issues.

The Court should not hold that plaintiffs were on inquiry notice at the time that

---

2  Tellingly, defendants do not claim that this and many other "odd" facts and actions tripped the running of the statutes of limitations.

they entered into the Shareholder Agreement. That holding would be manifestly against public policy concerns. Specifically, a finding that plaintiffs should have sued defendants immediately upon learning of Kampel's inappropriate conduct would encourage rampant litigation and discourage parties from settling outside of the courtroom. Plaintiffs tried to work out their issues with defendants. They should not be punished for doing so.

Defendant's conspiracy was a clever, complicated, and long-term scheme. To allow defendants to avoid liability on a statute of limitations defense because they were good at concealing their fraudulent misconduct would award and endorse such conduct.

III.    The Breach of Contract Claims Are Timely Regardless of When the Initial Breach Occurred.

First, contrary to defendants' contention, the ten year statute of limitations pursuant to 735 ILCS 5/13-205 applies to the breach of a written contract. Defendants cannot turn a written contract into an oral one by simply alleging that outside evidence may be used to prove the breach of contract claim.

Defendants cite Toth v. Mansell, 207 Ill.App.3d 665 (1st Dist. 1990) for the proposition that a contract is considered written only if all essential terms are reduced to writing and parol evidence is unnecessary. While this legal proposition is generally true, the application of Toth to the instant case has no merit and clearly ignores the facts pled.

The Toth plaintiff argued that certain invoices constituted a written contract and triggered the ten year statute of limitations. The Court found that the "promise to pay" was not written on the invoices and that parol evidence was necessary to prove an essential element of the contract. This ruling makes sense because there were conversations defining the contractual terms and because the invoices did not bind anyone.

16

In this case, the gravamen of plaintiffs' breach of contract counts rests upon the nonperformance of several written contractual obligations. Plaintiffs clearly set out the breach of specific written terms. Am.Compl. at ¶¶62-72.

Further, unlike Toth, plaintiffs allege a material implied covenant. An implied covenant not reduced to writing is completely different from a "promise to pay" missing from a written contract. Proving an implied covenant is a legal question and does not require introducing parol evidence of oral representations.

Second, even if they are correct that a five year breach of oral contract limitations period applies to this action pursuant to 735 ILCS 5/13-205, defendants conveniently ignore their continuing duty to abide by the 1997 Shareholder Agreement and their continuing breach of it.

As much as defendants would like it otherwise, the statute of limitations for all potential damages does not start to run upon their initial breach of the agreement. Skinner v. Shirley of Hollywood, 723 F.Supp. 50, 54 (N.D. Ill. 1989). "Where the potential harm is not clear,.... limitations should not run until damages become recoverably certain." Id. quoting Note, Developments in the Law: Statutes of Limitations, 63 Harv.L.Rev. 1177, 1206 (1950).

"Because each breach of a continuous duty has its own accrual date, a plaintiff may sue on any breach which occurred within the limitation's period, even if earlier breaches occurred outside the limitations period." C-B Realty and Trading Corp. v. Harris Trust & Savings Bank, 289 Ill.App.3d 892, 897 (1st Dist. 1997)(quoting Hi-Lite Products Co. v. Am. Home Products Corp., 11 F.3d 1402, 1409 (7th Cir. 1993)); Lee v. Allstate Life Ins. Co., 2005 Ill.App. LEXIS 995 at *17 (2d Dist. Sept. 29, 2005).

Accordingly, every time that defendants breached the Shareholder Agreement with MML (such as the first and second bankruptcies), a new cause of action arose. Each of those causes of action has its own statute of limitations for the breach of contract claims.

Plaintiffs' ultimate injury occurred on January 18, 2007 when Winterland came out of its second bankruptcy and the bankruptcy court allowed Cerberus and GBCC to sell essentially all of Winterland's assets. None of the statutes of limitations for the breach of contract claims ran by the time that plaintiffs filed suit in 2007.

Therefore, a ten year statute of limitations under 735 ILCS 13/206 applies to plaintiffs' lawsuit. Defendants' motion for sanctions must be denied at least as it pertains to all breach of contract claims.

IV.     Even if the Court Finds that the Statute of Limitations Ran on Any Count in the Amended Complaint, Sanctions Are Not Appropriate Against Plaintiffs.

Even if a defendant has a good limitations defense, it does not follow that sanctions are appropriate. The movant must prove frivolousness and a wilful improper purpose.

"'Sanctions are not automatically warranted where a party loses a dispositive motion.'" D'Angelo v. J&F Steel Corporation, 2003 U.S. Dist. LEXIS 16736 at *3 (N.D. Ill. Sept. 23 2003)(quoting Walter v. Fiorenzo, 840 F.2d 427, 436 (7th Cir. 1988)).

Significantly, courts frequently refuse to impose sanctions even where there is a successful statute of limitations defense. See O'Connell v. Champion Int'l Corp., 812 F.2d 393, 395 (8th Cir 1987)(Rule 11 requirement of reasonable inquiry into facts and law supporting pleading was not violated where plaintiffs had nonfrivolous argument for avoiding limitations bar); Kale v. Combined Insur. Co. of Amer., 861 F.2d 746, 758 (1st

18

Cir. 1988) (denying sanctions because plaintiff's argument for equitable tolling was not

frivolous despite the grant of summary judgment against him); Matzke v. Merck & Co.,

848 F. Supp 936 (D.C. Kan. 1994)(defendant will not be sanctioned for arguing that

plaintiff's refiling in federal court was untimely where the argument was not convincing

but was reasonable).

Plaintiffs have clearly laid out a reasonable explanation for not bringing their

claims until 2007. Their tolling of the statute of limitations argument is reasonable.

Their conduct is not sanctionable. Defendants have not shown otherwise.

Finally, even if the Court finds plaintiffs' tolling arguments unreasonable, the

filing of the Complaint and Amended Complaint was certainly not employed to harass

defendants or create costs of litigation. The Court should keep in mind the American

Rule that each party bears his own legal fees unless the other side acts in bad faith. In re

TCI, 769 F.2d 441, 445 (7th Cir. 1985); D'Angelo, 2003 U.S. Dist. LEXIS 16736 at *3.

> In ruling on a Rule 11 motion for sanctions, the Court may consider:
>
> Whether the improper conduct was willful, or negligent; whether it was
> part of a pattern of activity, or an isolated event; whether it infected the
> entire pleading, or only one particular count or defense; whether the
> person has engaged in similar conduct in other litigation; whether it was
> intended to injure; what effect it had on the litigation process in time or
> expense; whether the responsible person is trained in the law; what
> amount, given the financial resources of the responsible person, is needed
> to deter that person from repetition in the same case; what amount is
> needed to deter similar activity by other litigants: all of these may in a
> particular case be proper considerations.

Fed.R.Civ.P. 11, Notes of Advisory Committee on 1993 Amendments (2007).

In the instant case, plaintiffs are not lawyers honed in the law. Maduakolam v.

Columbia University, 866 F.2d 53, 56 (2nd Cir. 1989)(reversing sanctions based on time-

barred claims because there was no indication of bad faith on the part of the represented

parties and the court "may consider the special circumstances of litigants who are untutored in the law."). Plaintiffs are simply investors who lost substantial amounts of monies and wish to recoup their investment losses to which they are entitled. They do not know what the statute of limitations is for each claim or even what a statute of limitations is at all for that matter.

Furthermore, contrary to plaintiffs in <u>Hass v. Rico Enterprise</u>, 2004 U.S. Dist. LEXIS 11189 (N.D. Ill. June 18, 2004), who filed a "melange of unsupported, frivolous allegations" and "personal attacks," plaintiffs here only filed two pleadings in this case-- the original complaint and the amended complaint that their attorneys told them cured any potential defects in the original complaint.

In footnote 2 at page 5 of their Rule 11 motion, defendants tell the Court that plaintiffs publicized the lawsuit in an effort to cause harm to defendants. This fact is irrelevant and is not a proper ground for sanctions. Like any other citizen, plaintiffs are entitled to make fair comment about matters of public interest. Rule 11 is a carefully drafted and restricted device and does not apply to public comment about court documents. <u>In re Kunstler</u>, 914 F.2d 505 (4th Cir. 1990).

Furthermore, "if a complaint is filed to vindicate rights in court, and also for some other purpose, a court should not sanction [the party] for an intention that the court does not approve, so long as the added purpose is not undertaken in bad faith and is not so excessive as to eliminate a proper purpose." <u>Kunstler</u>, 914 F.2d at 518. It is clear that plaintiffs filed the lawsuit to vindicate their rights as investors and therefore sanctions against them are inappropriate.

V. <u>Monetary Sanctions May Not Be Imposed Against A Represented Party.</u>

Even if the Court finds that sanctions are appropriate it is unquestionable that the Court may not impose monetary sanctions against a represented party. Fed.R.Civ.P. Rule 11(c)(5)(A). At the time that the Amended Complaint was filed, plaintiffs were represented by their former attorneys.

Plaintiffs are not attorneys. As clients, they presented facts to their former attorneys and were advised that they had viable claims.

VI. <u>The Oral Rule 12(b) Motion Should Be Denied.</u>

For most of the same foregoing reasons, the Rule 12(b) motion should be denied.

In ruling on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b), the Court must assume the truth of all facts alleged in the complaint, construing the allegations liberally and viewing them in the light most favorable to the plaintiff. <u>Barr v. Wash. Mut. Bank</u>, 2004 U.S. Dist. LEXIS 14909 at * 4-5 (N.D. Ill. July 30, 2004). Dismissal is only proper if it is clear that no set of facts which the plaintiff could prove consistent with the pleadings would entitle the plaintiff to relief. Id. The Court accepts all well-pled factual allegations in the complaint as true. Id.

A complaint need not anticipate or overcome affirmative defenses such as a statute of limitations defense. <u>Gomez v. Toledo</u>, 446 U.S. 635 (1980); <u>Xechem, Inc. v. Bristol-Myers Squib Co.</u>, 372 F.3d 899, 901 (7th Cir. 2004); <u>Covington v. Mitsubishi Motor Manufacturers of America, Inc.</u>, 154 Fed.Appx. 523, 2005 U.S. App. LEXIS 24822 (7th Cir. Nov. 15, 2005). The Seventh Circuit finds it "irregular" to dismiss a claim as untimely under Rule 12(b)(6). <u>United States v. Northern Trust Co.</u>, 373 F.3d 886, 888 (7th Cir. 2004). A complaint does not fail to state a claim simply because some

defense is potentially available. Id.; United States Gypsum Co. v. Indiana Gas Co., 189

F.3d 492, 494 (7th Cir. 1999). Instead, dismissal under Rule 12(b)(6), on the basis of an

affirmative defense is appropriate only where the plaintiff pleads himself out of court by

"admitting all the ingredients of an impenetrable defense." Xechem, 372 F.3d at 901;

United States v. Lewis, 411 F.3d 838, 842 (7th Cir. 2005) (explaining that dismissal is

proper where complaint "plainly reveals that an action is untimely under the governing

statute of limitations"). In such cases, the validity of the defense must be "apparent from

the complaint itself" and "unmistakable." Walker v. Thompson, 288 F.3d 1005, 1010

(7th Cir. 2002).

## CONCLUSION

Defendants have not met their burden of proving that either the Complaint or

Amended Complaint was frivolous and filed for an improper purpose. Plaintiffs have

illustrated that they made a reasonable inquiry into their claims and have a reasonable

belief in the viability of their claims. Defendants are not entitled to sanctions. Their

motion for sanctions should be denied. Defendants' oral Rule 12(b) motion should be

denied as well.

s/Gregory A. Adamski
Plaintiffs' Attorney

Gregory A. Adamski
Samantha R. Engel
Adamski & Conti
100 N. LaSalle Street
Chicago, Illinois 60602
312.332-7800

## CERTIFICATE OF SERVICE

I, Gregory Adamski, an attorney, hereby certify that I electronically filed Plaintiff's Answer to Defendant's Rule 11 Sanctions and for Rule 12 Dismissal with the Clerk of the Court, using the CM/ECF system, which will send notification of such filing to the following:

Stephen A. Feinberg
Katten Muchin Rosenman LLP
525 W. Monroe Street, Suite 1900
Chicago, IL 60661

On this 29th day of January, 2008

s/Gregory A. Adamski
Gregory A. Adamski
Samantha R. Engel
Adamski & Conti
100 N. LaSalle Street
Chicago, Illinois 60602
312.332-7800
