**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| THE CANCER FOUNDATION, INC., et al., ) <br> ) <br> Plaintiffs, ) <br> ) <br> vs. ) <br> ) <br> CERBERUS CAPITAL MANAGEMENT, L.P., ) <br> et al., ) <br> Defendants. ) | No. 07-cv-4120 <br><br> Judge Joan H. Lefkow |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs The Cancer Foundation, Morton M. Lapides, Sr., MML, Inc., Transcolor Corp., Valley Rivet Company, Inc., VR Holdings, Inc., Charles Amera, Anne Amera, Sharon Boerger, Dorothy Brooks, Sue D. Burmester, Larry Feine, Gilbert Graham, Nancy L. Graham, James E. Heitkamp, Michael J. Heitkamp, Virginia Heitkamp Holland, Eugene M. Hitchcock, Florence E. Hitchcock, Robert Hummel, Kenneth L. Kluesner, Vernon Lyons, Ruth Lyons, Cecil E. Metz, Marilyn J. Munz, Anthony Spina, and Anita Spina (collectively, "plaintiffs") have filed an amended complaint against defendants Cerberus Capital Management, L.P., Madeleine, LLC, Gordon Brothers Group, the Third Avenue Value Fund, Warren Feder, Stephen Feinberg, and Martin J. Whitman (collectively, "defendants") alleging six counts: (1) fraudulent concealment, (2) breach of contract, (3) Civil RICO under 18 U.S.C. § 1961 *et seq.*, (4) conspiracy to engage in a pattern of a racketeering enterprise under the same statute, (5) tortious interference with an economic relationship, and (6) civil conspiracy.

Defendants now move for Rule 11 sanctions against plaintiffs or for dismissal of plaintiffs' amended complaint under Federal Rule of Civil Procedure 12(b)(6). For the following

reasons, defendants' motion [#41] is granted in part and denied in part. This case will be dismissed with prejudice.

**I.      Background**

    **A.      Facts**

These facts are taken from plaintiffs' amended complaint and are presumed true for the purpose of resolving the pending motions. Plaintiff MML, Inc. is the parent company of plaintiff Transcolor, a company that printed and sold screen-printed t-shirts. Amended Complaint ("AC") ¶¶ 5, 19. Transcolor's shirts were produced at its two plants. AC ¶ 20. From 1994 through 1996, Transcolor lost significant business because many of its customers were installing their own printing presses. AC ¶ 22. As a result, its plants were operating at approximately 20% of their capacity. AC ¶ 22.

Transcolor is the parent company of plaintiff Valley Rivet. AC ¶ 8. At some point during the time period relevant to plaintiffs' claims, plaintiff VR Holdings became the parent company of MML. AC ¶ 7. Plaintiff Morton M. Lapides is an individual who held an ownership interest in VR Holdings, MML, Transcolor, and Valley Rivet. AC ¶ 9.[1]

---

[1] Plaintiff Alleco, Inc. was another subsidiary of MML, Inc. AC ¶ 21. Plaintiffs Charles Amera, Anne Amera, Sharon Boerger, Dorothy Brooks, Sue Burmester, Larry Feine, Gilbert Graham, Nancy L. Graham, James E. Heitkamp, Michael J. Heitkamp, Virginia Heitkamp Holland, Eugene M. Hitchcock, Florence E. Hitchcock, Robert Hummel, Kenneth L. Kluesner, Vernon Lyons, Ruth Lyons, Cecil E. Metz, Marilyn J. Munz, Anthony Spina, and Anita Spina are holders of Senior Secured Notes that were originally issued by Alleco but upon which Transcolor eventually became jointly and severally liable. AC ¶ 3. Plaintiff The Cancer Foundation, Inc. is alleged to be a 501(c)(3) organization that is involved in raising funds to promote the use of alternative medicine concurrently with conventional remedies to treat and cure cancers. AC ¶ 4.

Winterland Concessions Company was a company that at one time held approximately 300 licenses that allowed it to print images on t-shirts authorized by numerous significant entertainers and sold at concerts and other locations. AC ¶ 23. In 1996, it was discovered that Winterland's primary plant contained a significant amount of asbestos. AC ¶ 24. Winterland's parent, Music Corporation of America ("MCA"), decided to sell Winterland instead of relocating or constructing a new plant. AC ¶ 24. Carl Kampel is an individual who was the Chief Financial Officer of Winterland and a member of its board of directors. AC ¶ 17. John Woods was general counsel of Winterland. AC ¶ 18.

In March 1996, MML began negotiations with MCA to purchase Winterland. AC ¶ 25. MML intended to purchase Winterland through a six-month term bridge loan and then consolidate Winterland with Transcolor. AC ¶ 26. On August 14, 1996, defendants Gordon Brothers Capital Corporation ("GBCC"),[2] Cerberus Capital Management, LLC ("Cerberus"), and Madeleine, LLC agreed to extend Winterland a $23 million short-term line of credit due in February 1997. AC ¶ 32. The line of credit transaction was secured by Winterland's receiveables, inventory, fixed assets, artist licenses, 100% of its stock, and guarantees from Lapides and MML. AC ¶ 32. MML and Kampel agreed that Kampel would stay on as Winterland's Chief Financial Officer and a member of its Board of Directors. AC ¶ 30. As part of MML's purchase of Winterland, Transcolor sold its inventory and leased its buildings and machinery to Winterland. AC ¶ 28.

---

[2] Defendant Gordon Brothers Group is the successor in interest to GBCC. AC ¶ 10.

Defendant Warren Feder is an individual who was the president of GBCC at all times relevant to the complaint. AC ¶ 13. Defendant Stephen A. Feinberg is an individual who was president of Cerberus at all times relevant to the complaint. AC ¶ 14.

In late November or early December 1996, with the unpaid portions of the line of credit coming due in February 1997, Winterland's financial situation became precarious. AC ¶ 36. Its relationships with some of its suppliers deteriorated. AC ¶ 38. A long-term line of credit was needed in order to keep Winterland operating and to satisfy the short-term line of credit with GBCC, Cerberus, and Madeleine. AC ¶ 38. Accordingly, Winterland management aggressively sought to secure long-term financing. AC ¶ 38.

Sometime between November 1996 and January 1997, Kampel, in violation of his contractual and fiduciary duties as an officer and director of Winterland, schemed to secretly assist GBCC and Cerberus in wresting control and ownership of Winterland from MML and to acquire a personal ownership stake in Winterland. AC ¶ 36. Specifically, Kampel secretly entered into an agreement with Feder and Feinberg that if GBCC took over Winterland, Kampel would continue as Chief Financial Officer and personally receive Winterland stock for an investment of $50,000. AC ¶ 43. In furtherance of this scheme, Kampel disobeyed directives from Lapides and refused to pursue potential sources of long-term financing in order to prevent Winterland from refinancing its short-term line of credit and force it to sell to GBCC and Cerberus. AC ¶¶ 39-41.

Winterland did enter into an agreement with Capital Factors, Inc. for a $1 million factor guaranty and/or letter of credit. AC ¶ 46. Capital Factors also issued a letter of intent to provide Winterland with receiveable-based financing for the purpose of replacing Winterland's line of

4

credit with GBCC. AC ¶ 46. In late February 1997, however, Feder orally exposed the conspiracy by informing Capital Factors that Kampel was on GBCC's "team." AC ¶ 47. As a result, Capital Factors concluded that there was a battle for control of Winterland and decided not to replace Winterland's short-term line of credit. AC ¶ 48.

Kampel was ordered by Winterland management to negotiate alternative long-term financing with defendants GBCC, Cerberus, and an additional company: defendant Third Avenue Value Fund, which was introduced as an alternative lender. AC ¶ 49.[3] Kampel was instructed that before he agreed to accept any long-term financing from GBCC and Cerberus that would result in MML's losing control of Winterland, Winterland would need sufficient notice to secure long-term financing from another source. AC ¶ 49. Kampel disobeyed Winterland's order and entered into an agreement calling for a March 15, 1997 closing date with GBCC and Cerberus, foreclosing alternative long-term financing with a third party. AC ¶ 50.

In late February 1997, Lapides and Woods learned from Capital Factors that Kampel and Feder had arrived at some sort of agreement. AC ¶ 53. On March 4, 1997, Lapides and Woods confronted Kampel and asked him if he was cooperating with GBCC and Cerberus to take over Winterland. AC ¶ 53. Kampel confessed that he and Feder had agreed that if Winterland were taken over by GBCC, Kampel would receive Winterland stock on favorable terms not generally available to others. AC ¶ 53. As a result of the March 4 meeting and Kampel's confession to acts of disloyalty and self-dealing, Kampel was removed from Winterland's board of directors and was barred from entering Winterland's premises or contacting any of its employees. AC

---

[3] Defendant Martin Whitman is an individual who was the President of Third Avenue at all times relevant to the complaint. AC ¶ 16. Plaintiffs allege that Third Avenue and Whitman participated in the conspiracy to wrest control of Winterland from MML. AC ¶ 37.

¶ 54. MML subsequently filed suit against Kampel for breach of fiduciary duty and related counts seeking recovery of the damage Kampel had caused to Winterland. AC ¶ 62.[4]

On April 11, 1997, GBCC and Cerberus (through Madeleine) entered into a Shareholder and Settlement Agreement whereby (1) GBCC and Cerberus became 80% owners of Winterland and MML was relegated to a 20% ownership of Winterland; (2) MML agreed to dismiss its lawsuit against Kampel; (3) GBCC and Cerberus agreed not to re-hire Kampel; (4) GBCC and Cerberus agreed to extend the maturity dates for the short-term line of credit by twenty-four months from the Agreement execution date; (5) for a one year period extending from April 11, 1997 to April 10, 1998, GBCC and Cerberus agreed to consider in good faith any offer by MML to repurchase the stock that was being transferred to GBCC and Cerberus; (6) during the same time frame, if GBCC or Cerberus received an offer for the shares subject to the agreement, Lapides and MML would be given the right of first refusal at the offered price; (7) the parties agreed that each would "do and perform ... all such further acts and things and shall execute and deliver all such other agreements, certificates, instruments, and documents as any other party ...

---

[4] Defendants attached a copy of this complaint as Exhibit A to their Reply Brief. It is dated July 2, 1997 and was filed in the United States District Court for the District of Maryland as Case No. K-97-2147. The court takes judicial notice of this document because it is a matter of public record. As an example, paragraph 24 of this 1997 complaint alleges,

> Sometime between November, 1996 and January, 1997, Kampel, in violation of his contractual and fiduciary duties as an officer and director of Winterland, determined that he would secretly assist a third-party in wresting control and ownership of Winterland away from MML, Inc., and attempt to gain an equity position in the company for himself. In furtherance of this goal, Kampel determined that he would engage in overt acts of omission or commission to work against Winterland's financial interests, and to prevent Winterland from obtaining working capital, so that the mounting financial pressure would eventually force Winterland to sell to new owners who would be prepared to convey personal benefits to Kampel.

reasonably may request in order to carry out the intent and accomplish the purposes of th[e] Agreement and the consummation of the transactions contemplated hereby"; and (8) the parties agreed to a material implied covenant that GBCC and Cerberus would not interfere with Winterland's operations for one year. AC ¶ 63.

On August 8, 1997, GBCC and Cerberus placed Winterland into bankruptcy. AC ¶ 65. Accordingly, Winterland was no longer required to make payments under the Transcolor leases, causing Transcolor to lose $14 million annually. AC ¶ 66. As the lease payments were Transcolor's only source of revenue, it could no longer continue to operate. AC ¶ 66. The approximately $7 million in senior notes for which Transcolor was jointly and severally responsible with Alleco were in default. AC ¶ 67. Winterland was discharged from bankruptcy on or about July 5, 2000, and the Transcolor leases were formally terminated. AC ¶ 69.

Sometime in 2001, Kampel testified in a lawsuit brought by National City Bank against Lapides, Transcolor, and Alleco that he, GBCC, and Cerberus had arranged a sale of Winterland. AC ¶ 70.[5] On January 2, 2001, as part of their continuing conspiracy to control Winterland, GBCC and Cerberus again placed Winterland in bankruptcy. AC ¶ 71.

### B. Procedural History

Plaintiffs filed their original complaint in this case on July 23, 2007. On September 18, 2007, counsel for the Cerberus defendants served plaintiffs' attorneys with defendants' first Rule

---

[5] In *In re Transcolor Corp.* v. *Cerberus Partners, L.P.*, 258 B.R. 149, 151 (Bankr. D. Md. 2001), the court explained that "Transcolor filed the ... lawsuit, upon a cause of action for interference with contractual relations ... against the defendants [Cerberus, GBCC, and Madeleine], whom it alleged to be insiders of Winterland. The suit was based on the proposition that the defendants wrongfully caused Winterland to file bankruptcy and to reject its lease with Transcolor."

11 motion. Motion at 5. Plaintiffs replied by letter on September 27 that they intended to file an amended complaint on or before October 10, the end of the 21-day safe harbor period. *Id*. Plaintiffs did not file an amended complaint by October 10 and the Cerberus defendants filed their first Rule 11 motion with the court on October 11. *Id*. On October 23, 2007, plaintiffs filed their amended complaint.[6]

The amended complaint restates the original complaint in large part but adds the following: (1) allegations that GBCC's ultimate intent to take over Winterland was concealed from Lapides and Winterland management until an article appeared in the July 3, 2006 issue of Forbes Magazine regarding the decision made by Whitman and Third Avenue Value in 1997 to start investing in small cap stocks, *see* AC ¶¶ 45, 84 and Ex. B to Motion; (2) allegations that the alleged racketeering activity was not completed until January 2007 when Winterland exited its second bankruptcy and defendants "could first realize their ill-gotten gains," *see* AC ¶¶ 72, 97, 105; (3) a count for civil conspiracy, AC ¶¶ 116-19; and (4) allegations that the defendants breached "express written terms" of the Shareholder and Settlement Agreement, AC ¶ 90.

Defendants served plaintiffs with their consolidated Rule 11 motion (the motion that is now before the court) on November 9, 2007. On November 23, 2007, plaintiffs' counsel moved to withdraw from the case. Dkt. No. 36. On November 29, 2007, with the 21 day safe harbor period set to expire the next day, plaintiffs' counsel filed a motion to withdraw on an accelerated

---

[6] Plaintiffs moved to strike defendants' first Rule 11 motion, which was based on plaintiffs' original complaint, on the basis that they had filed an amended complaint. The court denied their motion because the plaintiffs did not withdraw their original complaint within the 21 day safe harbor period. Dkt. No. 26. Plaintiffs now contend that their original complaint may not be sanctioned, *see* Response at 1, which is similarly incorrect. *See Jackson* v. *Rohm & Haas Co.*, 2006 WL 680933, at *3 (E.D. Pa. March 9, 2006).

basis. Dkt. No. 38. Plaintiffs' counsel represented in that motion that "through multiple, privileged e-mail communications, Plaintiffs' Counsel recommended to Plaintiffs and their representatives that their First Amended Complaint be withdrawn." *Id.* at ¶ 7. The court granted their motion. Dkt. No. 40. Defendants filed their consolidated motion for sanctions against plaintiffs and plaintiffs' counsel on December 3, 2007. Dkt. No. 41. They later amended it to omit their request for sanctions against plaintiffs' former counsel and are now seeking sanctions only against plaintiffs themselves. Dkt. Nos. 46, 48. Plaintiffs are now represented by new counsel. The court has agreed to consider defendants' oral motion for Rule 12(b)(6) dismissal on statute of limitations grounds together with their motion for sanctions. Dkt. No. 48.

## II. Discussion

The central purpose of Rule 11 is to deter baseless or frivolous filings and abusive litigation practices. *See Cooter & Gell* v. *Hartmarx Corp.*, 496 U.S. 384, 393, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990). The text of Rule 11 provides in pertinent part,

> (b) **Representations to the Court**. By presenting to the court a pleading, written motion, or other paper – whether by signing, filing, submitting, or later advocating it – an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; [and]
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law.
> ***
> (c) **Sanctions**.
> (1) In General. If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation....
> ***

> (5) Limitations on Monetary Sanctions. The court must not impose a monetary sanction:
> (A) against a represented party for violating Rule 11(b)(2)....

Fed. R. Civ. P. 11.

The rule thus provides two main grounds for sanctions: the frivolousness clause and the improper purpose clause. *Fred A. Smith Lumber Co.* v. *Edidin*, 845 F.2d 750, 752 (7th Cir. 1988). The standard for imposing sanctions under either prong is an "objective determination of whether [the to-be-sanctioned party's] conduct was reasonable under the circumstances." *Id*.

Defendants argue that it is clear from the face of plaintiffs' original and amended complaints that all of their claims are hopelessly time-barred, as the alleged events giving rise to them occurred, for the most part, in 1996, 1997, or at the latest in 2001. Therefore, under Rule 11(b)(2) plaintiffs should have been aware that their claims were not warranted by existing law or by any nonfrivolous argument for a change in the law. Furthermore, defendants argue, because the plaintiffs have persisted with their obviously time-barred claims even after repeated notice of their claims' deficiencies and after plaintiffs' original counsel recommended that they withdraw their complaint, the court may conclude that the plaintiffs are pursuing this litigation for an improper purpose under Rule 11(b)(1).

The court will start with the RICO counts since they are the basis for federal jurisdiction. The statute of limitations for civil RICO suits is four years from the date that the plaintiffs discovered (or should have discovered if they had been diligent) that they had been injured by the defendants. *Limestone Dev. Corp.* v. *Village of Lemont, Ill.*, – F.3d –, 2008 WL 852586, at

*2 (7th Cir. April 1, 2008);[7] *see also Rotella* v. *Wood*, 528 U.S. 549, 558-59, 120 S. Ct. 1075, 145 L. Ed. 2d 1047 (2000). It is not the extent but the *fact* of injury that starts the period running. *Limestone*, 2008 WL 852586, at *7 (citing, *inter alia*, *Goodhand* v. *United States*, 40 F.3d 209, 212-13 (7th Cir.1994)). It is also not the last predicate act in the pattern of racketeering activity that starts the clock. *Id*. at *3; *see also Klehr* v. *A.O. Smith Corp.*, 521 U.S. 179, 117 S. Ct. 1984, 138 L. Ed. 2d 373 (1997).

For example, in *Limestone*, the plaintiff owned a tract of land that it wanted to develop and charged that the Village of Lemont, Illinois, acted in cahoots with others from 1993 to 2004 to prevent it from developing the property. 2008 WL 852586, at *1. Limestone sued the Village in state court twice, in 1992 and 1999. *Id*. It then filed suit in the Northern District of Illinois in 2005, repeating the same allegations from its state court suits but adding a civil RICO charge. *Id*. Most of the alleged predicate acts took place between 1993 and 2000, but Limestone also alleged that in 2003, the Village published a statement by the mayor revealing its true intentions to create a park on Limestone's property and that the statement led to the forced sale of the property for below market value. *Id*. at *2.

The court found that Limestone's argument that the "continuing violation" doctrine saved its RICO claim was not persuasive because "[a] pattern of trying to force out Limestone without having to pay the fair market value of its property was well established years before the 2003 predicate acts." *Id*. at *3. The court further explained, "Against this conclusion [Limestone]

---

[7] Defendants cited the district court opinion in *Limestone* (which was issued on January 25, 2007, well before plaintiffs filed their complaint) instead of the Seventh Circuit opinion, *see Limestone Development Corp.* v. *Village of Lemont*, 473 F. Supp. 2d 858 (N.D. Ill. 2007), because the Seventh Circuit had not yet issued its opinion. The Seventh Circuit affirmed the district court in all relevant respects. *See Limestone*, 2008 WL 852586, at *4.

argued that the harm caused by the old acts could not be quantified until Limestone sold its property at a loss. That is false." *Id*. at *4. "Difficulty in quantifying damages is cured not by waiving the statute of limitations but by granting equitable relief.... Limestone knew from at least 1993 that it was being injured by the defendants, and from 2000 at the very latest that it was being injured by a pattern of racketeering activity. It had no excuse for waiting six years after that to sue." *Id*. Therefore, all of the earlier frauds were out of the picture, and the court found that the one alleged fraudulent act that had occurred within four years of filing could not constitute a pattern of racketeering activity. *Id*.

> Plaintiffs here allege the following as the RICO racketeering activity:
>
> The conspiracy by Defendants GBCC, Cerberus, Madeleine, LLC, Third Avenue, Feder, Feinberg, and Whitman to defraud Plaintiffs, wrest control of Winterland, and abscond with the value of its assets is "racketeering activity" as that term is used [in] 18 U.S.C. § 1961(1)(a) by making false claims in wire communications and use of the U.S. Mail in furtherance of their intent to place Winterland into bankruptcy rather tha[n] maintain it as a viable concern, allow Plaintiffs to repay the remaining balance on the credit line loaned by GBCC and Cerberus through Madeleine, LLC, and then sell Winterland.
>
> The aforementioned racketeering activity was not completed until Winterland exited the Second Winterland Bankruptcy in January, 2007 when GBCC, Cerberus, Madeleine, LLC, Third Avenue, Feder, Feinberg, and Whitman could first realize their ill-gotten gains.

AC ¶¶ 96-97. Plaintiffs characterize their injuries as follows:

> Plaintiffs have been damaged as a proximate result because, among other things: (1) Plaintiffs Lapides, Transcolor, and MML, Inc. lost control over and their interest in Winterland and Winterland was forced into bankruptcy; (2) with Winterland in bankruptcy, Transcolor, too, was forced into bankruptcy because Winterland ceased paying under its leases with Transcolor; (3) with Transcolor in bankruptcy, Lapides has not been and will never be repaid the monies loaned to

>Transcolor;[8] (4) as a proximate result of Transcolor being forced into bankruptcy, Lapides was found personally liable to the Senior Note Holders for $7 million;[9] (5) as a proximate result of Transcolor being forced into bankruptcy, Valley Rivet was forced to seek bankruptcy protection because Transcolor could not repay the $3 million loaned by Valley Rivet;[10] and (7) The Cancer Foundation did not receive the $80 million donation pledged by VR Holdings.

AC ¶ 99.

It is abundantly clear from the face of both the original and amended complaints that plaintiffs were aware that they had been injured and aware of the existence of the alleged conspiracy by 1997, or at the very latest, by 2001. Kampel admitted the existence and plans of the conspiracy to the plaintiffs themselves. One of several examples of that is plaintiffs' allegation that on March 4, 1997, Lapides and Woods confronted Kampel and asked him if he was cooperating with GBCC and Cerberus to take over Winterland. AC ¶ 53. Kampel *confessed* that he and Feder had agreed that if Winterland were taken over by GBCC, Kampel would receive Winterland stock on favorable terms not generally available to others. AC ¶ 53. Winterland was then taken over by GBCC as Kampel predicted, AC ¶ 63, and it was placed into bankruptcy for the first time on August 8, 1997. AC ¶ 65. Plaintiffs further allege that sometime in 2001, Kampel testified in a lawsuit brought by National City Bank against Lapides, Transcolor, and Alleco *that he, GBCC, and Cerberus arranged a sale of Winterland*. AC ¶ 70. Finally, they contend that on January 2, 2001, as part of their continuing conspiracy to control Winterland, GBCC and Cerberus again placed Winterland in bankruptcy. AC ¶ 71.

---

[8] This event occurred in 2002. AC ¶¶ 74-75.

[9] This event occurred on June 13, 2003 (over four years before the filing of the original complaint on July 23, 2007). AC ¶ 76.

[10] This event occurred in 2000. AC ¶ 75.

Plaintiffs' attempts to argue that they were not aware, or even put on inquiry notice, of the defendants' involvement in a conspiracy to take over Winterland until 2006 are not credible. For example, in their response to the motion for sanctions, they say,

— "Plaintiffs did not understand and could not have fairly understood that Mr. Kampel was working with GBCC or Cerberus."

— "Winterland and MML had no reason to believe that [GBCC and Cerberus] were collaborating with Mr. Kampel."

— "In 2001, Mr. Kampel testified that he arranged the sale of Winterland to GBCC and Cerberus.... Plaintiffs did not understand the significance of this statement at the time and certainly did not interpret it to mean that defendants were conspiring with Mr. Kampel to take over Winterland."

— "[D]efendants' two pivotal events [i.e., Kampel's confessions in 1997 and his testimony in 2001] did not start the running of the statutes [of limitations] because they did not disclose or uncover defendants' involvement in the conspiracy to wrest control of Winterland or other unlawful conduct."

— "Mr. Kampel's statement that a sale of Winterland was 'arranged' does not infer conspiracy, concealment, and fraud, as plaintiffs allege today."

Response at 5, 8, 9, 14. Additionally, the presence of allegations very similar (and in some instances, nearly verbatim) to the ones made in this case in the 1997 and 2001 lawsuits cited above undermines plaintiffs' arguments that they did not understand what had happened until 2006.

Furthermore, plaintiffs' reliance on the 2006 Forbes article is disingenuous. First, GBCC and Cerberus took over Winterland nine years before this article appeared in print and plaintiffs knew that they had done so with the help of Kampel. Second, in plaintiffs' amended complaint, they characterize the article as reporting that Whitman had decided not only to invest in but also to *take over* small cap companies. The court has reviewed the article, however, as it may on this motion because plaintiffs incorporated it into their complaint, *TCF Nat'l Bank* v. *CVS Corp.*,

14

2007 WL 329152, at *1 (N.D. Ill. Jan 31, 2007) (citing *Venture Assocs. Corp.* v. *Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)), and found that the article does not take that additional step. Its most relevant paragraph states as follows: "Nine years ago, when the firm only had Third Avenue Value, Jensen [one of Whitman's associates] convinced Whitman that they needed to start a separate small-cap fund since Jensen had done well with small stocks in the past. Jensen ... detected a special energy in small-scale semiconductor-equipment makers .... His picks – with their large cash stashes, solid balance sheets and low price/earnings multiples – were in accord with the Whitman Way." *See* Ex. B to Motion, at page 3 of 6. Nothing was mentioned about any of the other parties or facts involved in this lawsuit. Furthermore, Third Avenue Value did not take over Winterland; GBCC and Cerberus did. Finally, even if the court could believe that plaintiffs did not piece everything together until 2006, that would not obviate the fact that they *should* have known.

The fact that the defendants did not "realize their ill-gotten gains" until 2007, at the close of Winterland's second bankruptcy is not a basis to toll the statute of limitations. A very similar argument was made and rejected in *Limestone*, as discussed above. 2008 WL 852586, at *4.

Plaintiffs also argue that the statute of limitations should be tolled because defendants actively and fraudulently concealed plaintiffs' causes of action. For example, they "contend that defendants entered into the Shareholder Agreement with ill intentions and in bad faith. This is, in essence, active concealment." Response at 15. Plaintiffs apparently misunderstand the concept of fraudulent concealment. Fraudulent concealment is a type of tolling within the doctrine of equitable estoppel. "Fraudulent concealment 'presupposes that the plaintiff has discovered, or, as required by the discovery rule, should have discovered, that the defendant

15

injured him, and denotes efforts by the defendant — above and beyond the wrongdoing upon which the plaintiff's claim is founded — to prevent the plaintiff from suing in time.' In order for a plaintiff to benefit from tolling for fraudulent concealment, he must show 'that he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense.'" *In re Copper Antitrust Litig.*, 436 F.3d 782, 790-91 (7th Cir. 2006) (citations omitted). Because plaintiffs here both should have known of the existence of their claims and obviously did know, equitable tolling does not apply to allow the filing of their complaint in 2007.

For all of these reasons, it is clear from the face of the amended complaint that plaintiffs' RICO claims are time-barred and must be dismissed. *See Draper* v. *Pickus*, 2007 WL 809679, at *4 (N.D. Ill. March 15, 2007) (Lefkow, J.) (citations omitted) ("A plaintiff can plead himself out of court ... when he alleges facts that affirmatively show that his suit is time barred."); *see also Limestone*, 2008 WL 852586, at *4. Because the court is dismissing the claims that support federal jurisdiction, it will also dismiss the state law claims. The question remains, however, of whether an award of monetary sanctions would be appropriate.

Monetary sanctions are not available against represented parties for violations of Rule 11(b)(2). In order to impose monetary sanctions against the plaintiffs themselves, the court would have to find under Rule 11(b)(1) that the plaintiffs presented their complaint for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.

Defendants argue that the plaintiffs' claims were so clearly time barred that they could have been filed for no other reason than to harass the defendants. In defendants' favor, the court notes that plaintiffs did receive explicit advice from their former counsel to withdraw their

complaint. One of the plaintiffs, Morton Lapides, appears to have experience with the court system; perhaps enough to know that the plaintiffs' claims were frivolous. Additionally, the simple fact that most of the operative facts of the complaint occurred over a decade ago could have been enough to put the plaintiffs on notice that their complaint might be improper. Finally, the suggestion that plaintiffs were not aware of their claims until reading the 2006 Forbes article is dubious.[11]

On the other hand, there is little in the materials indicating that the plaintiffs, of which there are 28, either collectively or individually had a purpose other than to vindicate perceived wrongs. Although defendants assert the purpose was to harass, engaging an attorney to file a lawsuit is not a typical mode of harassing another. There is no evidence, for example, of a threat to sue as retaliation or of a purpose to delay some other outcome. Although plaintiffs' original counsel was sufficiently wary of sanctions to bail into the safe harbor, the plaintiffs pursued this litigation with the apparent blessing of successor counsel. Moreover, there is no evidence of the extent to which the plaintiffs were individually informed and advised of the potential for sanctions. The court is mindful that an unmeritorious claim imposes unnecessary costs on the defending party. In this instance, however, the court is unable to find a purpose other than to seek relief in a court of law.

---

[11] Defendants suggest that other allegations and arguments made by the plaintiffs may also have been improper and sanctionable, such as their representations regarding the Cancer Foundation and their argument regarding Lapides's involvement in a related fraud. The court declines to address these issues or to comment on the merits of defendants' arguments because it is not in the interest of judicial efficiency to do so at this time.

For these reasons, the court will not impose monetary sanctions against the plaintiffs. They are admonished on the record, however, as are their current attorneys, that any future filings may not be received with such grace.

### III.  Conclusion and Order

For all the reasons stated above, defendants' consolidated motion for sanctions and for dismissal [#41] is granted in part and denied in part.  This case is dismissed and terminated.  Any other pending motions are denied as moot.

DATED: April 4, 2008                    ENTER: _____
                                            Joan Humphrey Lefkow
                                            United States District Judge