

CERTIFIED COPY
A True Copy
Teste:
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-1981

THE CANCER FOUNDATION, INC. et al.,

    *Plaintiffs-Appellants*

*v.*

CERBERUS CAPITAL MANAGEMENT, LP et al.,

    *Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 4120—**Joan Humphrey Lefkow**, *Judge*.

ARGUED JANUARY 15, 2009—DECIDED MARCH 19, 2009

Before RIPPLE, MANION, and EVANS, *Circuit Judges*.

EVANS, *Circuit Judge*. In 1997, Martin Lapides was at the center of a web of companies that were tanking. With a multimillion dollar line of credit coming due, he was forced to enter into a refinancing agreement that meant he lost majority ownership of one of his companies, Winterland. Winterland soon went bankrupt, setting off a storm of financial harm. Ten years after losing control

of Winterland, Lapides, along with others who were allegedly harmed by the takeover, filed suit against the financiers involved in the meltdown under the Racketeer Influenced and Corrupt Organization Act (RICO). The district court found that the racketeering counts—the only federal claims in the complaint—were untimely and dismissed the suit. The plaintiffs now appeal.

We begin by recounting the facts in the complaint, whose allegations we accept as true since the district court dismissed the complaint for failing to state a claim. *Hollander v. Brown*, 457 F.3d 688, 690 (7th Cir. 2006). Transcolor, one of Lapides' companies, manufactured and sold screen-printed shirts. The company was struggling in 1996, operating at only 20 percent of its capacity. Hoping to get the company out of this rut, Lapides decided to purchase Winterland Concessions Company through MML, Transcolor's parent company (Lapides had an ownership stake in MML as well). Winterland held hundreds of licenses to print T-shirts of some well-known rock stars—Madonna, Jimi Hendrix, and the Doors to name a few. As part of this sale, Winterland leased Transcolor's unused equipment, providing Transcolor with some much-needed revenue. Winterland then turned to the defendants Gordon Brothers Group, Cerberus Capital Management, and Madeleine for a cash infusion. These defendants extended Winterland a short-term, $23 million line of credit, secured by Winterland's receivables, inventory, and licenses, as well as a personal guarantee from Lapides himself.

The line of credit turned out to be a disaster. With the unpaid portions of the loan coming due, Winterland's

No. 08-1981 3

financial situation was becoming increasingly precarious. Winterland's chief financial officer, Carl Kampel, met with Gordon Brothers' president and learned that Gordon Brothers was targeting Winterland for a takeover. The president of Gordon Brothers promised Kampel that if the defendants got control of Winterland he could keep his job and receive an equity stake in the company. Kampel thought the offer was good and began surreptitiously helping the defendants gain control. He sabotaged Winterland's relationships with its suppliers and, with the help of the defendants, stymied Winterland's efforts to find alternative financing. By the spring of 1997, Lapides got wind of Kampel's disloyalty and confronted him. Kampel confessed to the agreement he had with Gordon Brothers and was fired for his double-crossing. But the damage was already done. Winterland could not get its hands on alternative financing and so it was forced to accept a deal with Gordon Brothers and Cerberus, which extended the 1996 line of credit but gave the financiers an 80 percent ownership interest in Winterland. But all was not lost—Gordon Brothers and Cerberus promised (although not in writing) that they would stay out of Winterland's operations for at least one year.

But Gordon Brothers and Cerberus allegedly (again, everything we are saying comes from the plaintiffs, and of course we don't vouch for its accuracy) went back on their word. In August 1997, just a few months after the refinancing deal was inked, Gordon Brothers and Cerberus placed Winterland in bankruptcy. And the bankruptcy allegedly sparked a huge financial fallout. While in bank-

ruptcy, Winterland was relieved of its obligation to pay its lease with Transcolor. By then, the lease payments were Transcolor's only source of revenue, so by 1998 Transcolor itself was forced into bankruptcy. Transcolor's bankruptcy meant that it could not make good on loans it had received from Lapides and his other corporations, like Valley Rivet. In 2000, Valley Rivet went under in the wake of Transcolor's bankruptcy, which imperiled its holding company, VR Holdings, another company in which Lapides had an ownership interest. Because of Valley Rivet's bankruptcy, VR Holdings could not fulfill its pledge, made in 1998, to donate $80 million to the Cancer Foundation.

Transcolor's bankruptcy was also bad news for the 21 individual plaintiffs named in this suit who held senior secured notes originally issued by one of Transcolor's sister corporations, but upon which Transcolor eventually became jointly and severally liable. Those notes were in default by 1998, and the trustee for the note holders filed suit against Lapides, Transcolor, and the sister corporation, seeking recompense. In 2001, during that trial, Kampel testified that Gordon Brothers and Cerberus had arranged to sell Winterland. Lapides lost that suit and was found personally liable to the note holders for $7 million.

In July 2007, the plaintiffs began this suit by filing a complaint which alleged that the defendants, along with Kampel, conspired to wrest control of Winterland and engaged in racketeering activity in furtherance of this scheme. The defendants immediately questioned the

Case: 1:07-cv-04120 Document #: 76 Filed: 04/10/09 Page 5 of 11 PageID #:598

suit's timeliness and responded by writing a letter to plaintiffs' counsel, explaining that they intended to move for sanctions under Federal Rule of Civil Procedure 11 if the complaint was not withdrawn within the 21-day safe-harbor period. *See* Fed. R. Civ. P. 11(c)(2). The plaintiffs did not withdraw their complaint and, true to their word, the defendants moved for sanctions.

Shortly after this motion was filed, and well outside the safe-harbor period, the plaintiffs filed an amended complaint, which tracked, for the most part, the factual allegations in the first complaint. But the amended complaint added that Gordon Brothers' "ultimate intent to take over Winterland was concealed from Lapides and Winterland management until an article appeared in the July 3, 2006 issue of Forbes magazine . . . ." Through that article, Lapides allegedly learned that Third Avenue Value Fund and its president, Martin Whitman (defendants in this case), decided to invest and take over "small cap companies" in 1997, the same year that Lapides lost control over Winterland. Third Avenue was introduced to Winterland as a possible alternative lender when Winterland was seeking refinancing to cover the line of credit. Apparently, only after reading this article Lapides realized that Third Avenue had been in cahoots with Gordon Brothers, Cerberus, and Madeleine all along.

The defendants felt that the new factual allegations added nothing to the complaint and reiterated to plaintiffs' counsel their belief that the suit was frivolous. This time, before the safe-harbor period was up, plaintiffs' counsel sought leave to withdraw from the case. Counsel

explained that he had recommended that the plaintiffs withdraw the amended complaint, but they had refused to do so. Counsel was granted leave to withdraw, and the defendants then filed a second Rule 11 motion. The plaintiffs eventually acquired new counsel who argued that they did not fully appreciate the defendants' conspiracy to take over Winterland until Lapides read the Forbes article, which illuminated the fact that Third Avenue was targeting small companies for takeovers. In their reply, the defendants argued that the plaintiffs mischaracterized the article and that, in any event, it was irrelevant. The defendants also pointed out that Lapides' earlier efforts to seek judicial relief for Winterland's bankruptcy undermined the plaintiffs' current attempts to disclaim knowledge of the conspiracy until 2006. In 1997, while Lapides was still working there, Winterland sued Kampel for his disloyal actions. Transcolor also sued Gordon Brothers, Cerberus, and Madeleine for placing Winterland in bankruptcy and rejecting their lease agreement, a suit that was dismissed in 2001. *See In re Transcolor Corp. v. Cerberus Partners, L.P.*, 258 B.R. 149 (Bankr. D. Md. 2001).

The district court concluded that the suit was untimely, reasoning that it was "abundantly clear from the face of both the original and amended complaints that plaintiffs were aware that they had been injured and aware of the existence of the alleged conspiracy by 1997, or at the very latest, by 2001." Having dismissed the RICO claims, the district court declined to exercise jurisdiction over the state law claims raised in the complaint. The court, however, declined to impose sanctions on plaintiffs' counsel.

No. 08-1981 7

The plaintiffs, with the help of new appellate counsel, appeal. The defendants have elected *not* to appeal the order denying their request for sanctions.

The statute of limitations for a civil RICO cause of action is a fairly generous four years. It begins to run when the plaintiffs discover, or should, if diligent, have discovered, that they had been injured by the defendants. *Limestone Dev. Corp v. Village of Lemont, Ill.*, 520 F.3d 797, 800 (7th Cir. 2008). A plaintiff does not need to know that his injury is actionable to trigger the statute of limitations—the focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim. *Rotella v. Wood*, 528 U.S. 549, 555, 558 (2000) (statute of limitations begins running even if the plaintiff is unaware of the pattern of racketeering activity). Dismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations. But dismissal is appropriate when the plaintiff pleads himself out of court by alleging facts sufficient to establish the complaint's tardiness. *Hollander*, 457 F.3d at 691 n.1.

We agree with the district court—it is clear from the face of the amended complaint that it is hopelessly time-barred. The RICO counts are based on the defendants' alleged conspiracy to defraud the plaintiffs by wresting control of Winterland and absconding with its assets. This purported plot was complete by 1997, a decade before this suit began. By that time, the defendants had acquired an 80 percent ownership interest in Winterland

and placed it into bankruptcy. Transcolor, without lease payments from Winterland, went bankrupt in 1998, which, in turn, prevented it from paying back debts owed to the plaintiffs, including the 21 senior note holders. By 2000, the time of Valley Rivet's bankruptcy, VR Holdings determined that it could not fulfill its $80 million donation pledge to the Cancer Foundation. This suit was filed in 2007, seven years after all these events transpired, well outside the statute of limitations. The plaintiffs try to get around these facts by noting that they were unaware of the defendants' racketeering conspiracy until much later. But that's beside the point—it is the discovery of the injury, not the elements of a particular claim, that gets the clock ticking. *Rotella*, 528 U.S. at 555.

The plaintiffs also try to beat the statute of limitations by claiming that they could not have known about Third Avenue's role in the conspiracy before reading the 2006 article in Forbes. Appellate counsel for the plaintiffs retreated from this argument during oral argument, and rightly so. The argument is ridiculous. For starters, it is based on a misreading (and that's being generous) of the article.[1] In the amended complaint, the plaintiffs contend that the article states that Third Avenue, through its president, Whitman, decided to start taking over "small cap companies" back in 1997, the same year Winterland

---

[1] We consider the article, which the defendants submitted to the district court, as part of the pleadings because it is a central component to the complaint. *See Venture Assoc. Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir. 1993).

No. 08-1981                                      9

was targeted. The article says nothing of the sort. It actually describes Whitman as a cantankerous but savvy investor, in the twilight of his career, who, on the advice of one of his prodigies, decided to start a separate fund to invest in, not take over, small capital projects. The picks were focused on makers of small-scale semiconductor equipment who had large cash stashes and solid balance sheets. Nothing in the article suggests that Third Avenue was interested in taking over companies, or even that it was interested in investing in small companies like Winterland, a highly leveraged T-shirt manufacturer. The article is irrelevant. What's more, even if the plaintiffs' description of the article was accurate, it would do them little good. The article's late date does not change the fact that the takeover of Winterland—the injury at the heart of this suit—was a fait accompli by 1997.

In an attempt to salvage at least part of the complaint, the plaintiffs also contend that the senior note holders and the Cancer Foundation did not plead themselves out of court, since no facts show that they knew who injured them until recently. This argument is unconvincing. The senior note holders knew of their injury by 1998, when their notes were in default. The following year, the trustee filed suit against Lapides on their behalf, and in that suit Kampel testified that Gordon Brothers and Cerberus had arranged a sale of Winterland. The defendants' takeover of Winterland formed the factual backdrop of the trustee's suit. The plaintiffs argue that this suit only shows that the trustee, not the note holders themselves, knew who was at the bottom of the scheme. But the senior note holders were not allowed to bury their

heads in the sand—to know you've been injured and make no effort to find out by whom is the very laxity that statutes of limitations are designed to penalize. *United States v. Duke*, 229 F.3d 627, 630 (7th Cir. 2000). Even the most cursory investigation would have uncovered the trustee's suit, leading back to the defendants. The same is true for the Cancer Foundation. It claims to have lost a donation, pledged in 1998, which was doomed by Valley Rivet's bankruptcy in 2000. Those events transpired seven years before this suit began, well outside the statute of limitations.

The plaintiffs make one last-ditch effort to save their case. They contend that even if they filed their suit outside of the statute of limitations, the defendants should be equitably estopped from raising the complaint's timeliness as a defense. Equitable estoppel, sometimes known as fraudulent concealment, "suspends the running of the statute of limitations during any period in which the defendant took active steps to prevent the plaintiff from suing . . . ." *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm.*, 377 F.3d 682, 689 (7th Cir. 2004) (citations omitted). Classic examples include hiding evidence, destroying evidence, or promising not to plead the statute of limitations. *In re Copper Antitrust Litig.*, 436 F.3d 782, 790-791 (7th Cir. 2006). The plaintiffs claim that the defendants lulled them into inaction when Winterland—which was then controlled by Gordon Brothers and Cerberus—sued Kampel in 1997. The plaintiffs contend that as the majority owners, the defendants put their stamp of approval on the suit against Kampel, posing as the good guys while hiding their own roles in the conspiracy.

This argument is untenable. The suit hid nothing. In fact, the complaint filed against Kampel formed the basis of the present suit—pages from that complaint are repeated, almost word for word, in the amended complaint.[2] Both complaints lay out the plot to wrest control of Winterland, including Gordon Brothers' assurances that, if they were successful in taking over the company, Kampel would keep his job and get a personal stake in the company. Far from preventing the plaintiffs from suing on time, the suit paved the way for the plaintiffs' present litigation. The plaintiffs' claim that the defendants' malfeasance was somehow obscured by the suit is further belied by their own conduct. Transcolor, one of Lapides' companies, suspected these defendants were up to no good early on—it previously filed an unsuccessful suit against Gordon Brothers, Cerberus, and Madeleine for causing Winterland to file bankruptcy and reject the lease, which was adjudicated by 2001. *Transcolor Corp.*, 258 B.R. 149. The present suit, which was filed nearly six years after Transcolor's suit was finished, is too late.

Accordingly, the judgment of the district court is AFFIRMED.

---

[2] We take judicial notice of the complaint in *Winterland Concessions Co. v. Kampel*, No. 97-2147 (D. Md. 1997), which is part of the public record and part of the record in this case. *Anderson v. Simon*, 217 F.3d 472, 474-75 (7th Cir. 2000).